COMMONWEALTH *vs.* BENJAMIN ALVAREZ
(and a companion case[1]).

No. 96-P-1714.

Worcester. November 6, 1997. - April 7, 1998.

Present: PERRETTA, KASS, & GREENBERG, JJ.

*Search and Seizure,* Threshold police inquiry, Automobile. *Constitutional Law,* Search and seizure.

In the circumstances of a lawful stop of a motor vehicle for speeding, the State troopers had no objective basis for requiring the passenger to produce identification papers, and where that unlawful interrogation led to a search that produced a cache of cocaine secreted in the vehicle, the defendants, the passenger and driver, were entitled to suppression of the fruits of the search. [534-536]

INDICTMENTS found and returned in the Superior Court Department on February 10, 1993.

Pretrial motions to suppress evidence were heard by *Daniel F. Toomey,* J., and the cases were tried before *John C. Cratsley,* J.

*Roderick B. O'Connor* for Benjamin Alvarez.

*Stephen D. Judge (Ronald Ian Segal* with him) for Diomedes Crespo.

*Brian J. Cann,* Assistant District Attorney, for the Commonwealth.

KASS, J. Two State troopers stopped the defendants at about 9:20 P.M. on November 19, 1992, for speeding. One of the troopers asked the operator of the car for his driver's license and the car registration, and then asked the front seat passenger for identification. The second request, that of the passenger, set off a chain of inquiry that led to the discovery of approximately $24,000 to $25,000 worth of cocaine. Both the operator, Benjamin Alvarez, and the passenger, Diomedes Crespo, were

---

[1]Commonwealth vs. Diomedes Crespo.

convicted of trafficking in cocaine. We decide that under the line of cases culminating in *Commonwealth* v. *Torres*, 424 Mass. 153 (1997), asking the passenger for identification, in the circumstances, violated art. 14 of the Declaration of Rights of the Massachusetts Constitution, i.e., the request amounted to an unlawful seizure. Accordingly, we vacate the order of the Superior Court denying the defendants' motions to suppress evidence, and we reverse the convictions of both defendants.

1. *Facts.* While on patrol on Interstate 84 near Sturbridge, State Troopers Brooks and Sullivan clocked a car, a Chevrolet Monte Carlo, going between seventy and seventy-two miles per hour in a fifty-five mile per hour zone. The troopers signaled the car to pull over, and the driver did so. Trooper Brooks approached the car on the driver's side, while Trooper Sullivan approached on the passenger's side. The car was being driven by the defendant Benjamin Alvarez. Diomedes Crespo, a codefendant, was in the front passenger's seat and a third person, Sumilda Molina, was in the back seat.

Trooper Brooks asked Alvarez for his license and registration through the open driver's side window. Alvarez complied by producing a Florida driver's license and obtaining a Massachusetts registration for the car he was driving from Molina. Trooper Brooks then asked Molina for identification. In broken English, she replied that she had none, but gave her name, address, and birth date in response to further questioning from the trooper. Turning his attention to Crespo, Trooper Brooks asked him for identification. Crespo produced a Florida driver's license and gave it to Brooks.

Back in his cruiser, Trooper Brooks ran the licenses and registration through his computer to determine whether they were valid, and also checked to see whether there were outstanding warrants for the arrest of Crespo or Alvarez. His computer verified that the licenses and registration were valid and turned up no adverse information. There were data on the licenses, however, that attracted Brooks's special attention. He noticed that the licenses produced by Crespo and Alvarez were both issued in Florida on the same date, that the sequential license numbers were only three apart, and that the home address of Crespo resembled that of Alvarez, except that the street number on one was 1244 and on the other was 1422, i.e., they seemed to be mirror images of each other. His suspicion aroused, Brooks returned to the car to question Crespo and Alvarez.

As to the car registration check, it had reported Molina's birth date as June 8, 1964. Brooks remembered her as having told him her birth date was July 8, 1963, but Brooks did not attach significance to the discrepancy. He testified at the suppression hearing that the peculiar similarities of the driving licenses had aroused his suspicion and had spurred his further questioning of Crespo and Alvarez. Brooks did not return to the car to interrogate Molina. There is, therefore, no occasion to consider whether the difference in Molina's birth date as given and confirmed was a sufficient indicator of illegal activity to justify further interrogation of the occupants of the car.

On the basis of the license oddities, Brooks came to the passenger side of the car and knocked on the window. Crespo opened the passenger side door in response, and as he did, Brooks saw "a pharmaceutical fold in the door pull." A "pharmaceutical fold," as described by Brooks "through my training and experience" is "a piece of paper, either a dollar bill or a section of a magazine, has been used and folded in a particular — a small envelope which is referred to as a pharmaceutical fold, and it is to contain controlled substance." In this case, the pharmaceutical fold was, indeed, a dollar bill. Brooks palmed the folded bill.[2] Next, Trooper Brooks focused his attention on Molina. He asked where she and her companions were traveling from. She said, New Rochelle. That answer prompted Brooks to order Molina out of the car. As she stepped out, Brooks noticed that a louver designed to cover an air vent in the car was missing, signifying to him, based on his background, training, and experience, that the cavity in the door was being used as a hidden compartment to secret narcotics.

As his suspicion mounted, Brooks discovered other telltale modifications to the car. He was moved to call for a trained narcotics dog. Another officer brought Lardo, a "narc" dog, to the scene, and Lardo made two "hits," i.e., he bit and scratched two areas of the car where he sniffed drugs. At this juncture, the troopers detained Alvarez, Crespo, and Molina and had the car towed to the Sturbridge police barracks. After obtaining a search warrant, the police dissected Molina's automobile and found approximately a kilo of cocaine in a quarter panel on the left side of the vehicle. Alvarez and Crespo were tried before a jury for trafficking in cocaine in excess of 200 grams and were found guilty. Although the defendants have raised multiple claims of

---

[2]The bill was later determined to contain a small amount of cocaine.

error, we concentrate on whether the motion to suppress the fruit of the car search was properly denied.

2. *The request for identification from Crespo.* If, during a routine traffic violation stop, the driver of the car produces a valid license and registration, the officer, ordinarily, may issue a citation for the traffic offense and must then allow the car to continue on its way. *Commonwealth* v. *Ferrara*, 376 Mass. 502, 504-505 (1978). *Commonwealth* v. *Torres, supra* at 158. *Commonwealth* v. *Figueroa*, 18 Mass. App. Ct. 967, 967-968 (1984). *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468, 470-471 (1996), and cases cited. *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 556-557 (1996). The trooper may not interrogate passengers in the car unless the trooper has a "reasonable suspicion, grounded in specific, articulable facts," that a particular passenger in the car is involved in criminal activity or "engaged in other suspicious conduct." *Commonwealth* v. *Torres, supra* at 158.

Trooper Brooks testified that he asked for Crespo's identification as a matter of routine practice. Indeed, Brooks said on cross-examination that, if he made a stop for speeding and the driver had seven passengers, he would normally ask all seven of them for identification. That response illustrates the sort of dragnet interrogation about which the cases culminating in *Torres* express concern. There is nothing in the record that gave Brooks reason to suspect Crespo of wrongdoing, and there was no basis for asking Crespo for his identification other than quizzing all the possible suspects.

Nor was there any plausible, non-investigatory reason for Brooks to have asked Crespo for identification as a matter of routine practice. For instance, Brooks did not testify that he had reason to fear for his own safety, as in *Commonwealth* v. *Vanderlinde*, 27 Mass. App. Ct. 1103, 1104 (1989) (reasonable fear for their safety justified officers in ordering driver and passenger out of their car and conducting a protective sweep of the passenger compartment, when the driver had first tried to evade capture, and the passenger then reached into the well between the front seats during the stop), or to suppose that Crespo might be in need of some assistance, as in *Commonwealth* v. *King*, 389 Mass. 233, 242, 244 (1983), in which the court treated as appropriate the request for licenses from both the occupant of the driver's seat and the occupant of the passenger's seat when the trooper approached a car sitting at a rest stop during the

winter. The court noted that the purpose of the detention, to determine whether the occupants were in need of assistance or aid, was "entirely different" from the purpose for a vehicle use regulations stop. *King, supra* at 242.

Similarly, questioning of a passenger was justified in *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 312-313 (1992), when a driver, who had identified himself but could not produce a license, said that his front seat passenger could confirm his identity and in *State* v. *Mennegar*, 114 Wash. 2d 304, 309-313 (1990), when a passenger agreed to drive after the driver had been arrested for drunk driving.

Interrogation of passengers in a car stopped for a traffic offense, without an objective basis for suspicion that the passenger is involved in criminal activity, slips into the dragnet category of questioning that art. 14 prohibits. *Commonwealth* v. *Torres*, 424 Mass. at 158-161. Accord *State* v. *Damm*, 246 Kan. 220, 224-225 (1990) (improper to extend routine traffic stop to run warrant check on passengers absent reasonable suspicion that there were outstanding warrants on them); *State* v. *Larson*, 93 Wash. 2d 638, 641-645 (1980) (police request for identification from passengers, without reasonable suspicion that the passengers were engaged in criminal conduct, during stop of a driver for a parking violation was prohibited under the Fourth Amendment to the Constitution of the United States).

In a careful memorandum of decision, the Superior Court judge who acted on the suppression motion (he was not the trial judge), relied in part on G. L. c. 85, § 16, to justify interrogation of Crespo. That statute, whose source is St. 1911, c. 578, . § 3, provides:

> "Every person shall while driving or in charge of or occupying a vehicle during the period from one hour after sunset to one hour before sunrise, when requested by a police officer, give his true name and address."

Desuetude characterizes the history of the statute in case law. We have not found a single reference to it. Until 1989, § 16 did not apply to motor vehicles. See G. L. c. 85, § 17, prior to amendment by St. 1989, c. 341, § 60. Were § 16 read to permit dragnet interrogation of the sort we have described as prohibited, questions about the constitutionality of that statute would necessarily arise. We need not reach that constitutional

question in the instant case, however, because the State trooper, when he asked for identification, i.e., documents, went significantly beyond simply asking an occupant of a vehicle to give her or his true name and address. The statute does not authorize the more searching inquiry that a random request for identification papers constitutes — the sort of request uncomfortably associated with authoritarian societies and most commonly made of persons belonging to a racial or ethnic minority. See Johnson, Race and Decision to Detain a Suspect, 93 Yale L.J. 214 (1983); Harris, Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked, 69 Ind. L.J. 659, 660 (1994). Cf. *Commonwealth* v. *Bodden*, 11 Mass. App. Ct. 964 (1981).

The unlawful interrogation of Crespo led, as we have described, to the search that produced the cache of cocaine secreted in Molina's car. The defendants, therefore, were entitled to suppression of the fruits of the search. *Commonwealth* v. *Ferrara*, 376 Mass. at 505. *Commonwealth* v. *Torres*, 424 Mass. at 163. *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. at 555.[3] Without Crespo's license for comparison, Alvarez's license would have been unremarkable.

Had the motions to suppress been allowed before or during trial, the Commonwealth's case as presented would have lacked essential proof. Accordingly, the defendants' motions for required findings of not guilty must now be allowed and judgments of not guilty must be entered. *Commonwealth* v. *Silva*, 366 Mass. 402, 410-411 (1974). The judgments of conviction are reversed, the verdicts are set aside, and judgments shall enter for the defendants.

*So ordered.*

---

[3]Under Massachusetts law, Alvarez had automatic standing to base his motion to suppress on the unlawful interrogation of Crespo. See *Commonwealth* v. *Amendola*, 406 Mass. 592, 599-601 (1990); *Commonwealth* v. *Alvarado*, 420 Mass. 542, 543 n.2 (1995); *Commonwealth* v. *Carter*, 424 Mass. 409, 410-411 (1997); Smith, Criminal Practice and Procedure § 1338 (Supp. 1997).