*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 43**

**Amended Opinion\***

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellant,*

*v.*

GEORGE M. MARTINEZ, JR.,
*Appellee.*

No. 20141043
Filed August 2, 2017

On Certification from the Court of Appeals

Third District, Salt Lake
The Honorable Ann Boyden
No. 141900017

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Solic. Gen.,
Mikelle C. Daugherty, Salt Lake City, for appellant

Joan C. Watt, Ralph W. Dellapiana, Salt Lake City, for appellee

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

---

\* After this opinion issued, the State petitioned for rehearing and asked this Court to remove footnote 1. Footnote 1 explains the scope of this Court's holding. Because it is important to define precisely the question this Court decided and the question we declined to decide, we deny the State's request to remove the footnote. We have, however, amended the footnote to clarify that the State's invitation to reframe the issue came in response to questions it received at oral argument.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1  A Utah Highway Patrol Trooper stopped a vehicle for an improper lane change and asked both the driver and George Matthew Martinez, a passenger, for identification. The trooper ran a warrant check and learned that Martinez had an outstanding arrest warrant. The officer searched Martinez incident to his arrest and discovered a glass pipe with methamphetamine residue inside. The State charged Martinez with possession of a controlled substance, but the district court granted Martinez's motion to suppress the evidence. The district court concluded that the trooper had violated Martinez's Fourth Amendment rights when he asked to see Martinez's identification and ran a warrants check without reasonable suspicion that Martinez had committed or was about to commit a crime. The State appeals the district court's suppression order, arguing that an officer may ask a passenger to supply his identification and run a background check on him during a routine traffic stop. We hold that officer safety concerns justified the negligibly burdensome extension of the traffic stop and reverse the district court's order.

## BACKGROUND

¶2  Utah Highway Patrol Trooper Jeremy Horne stopped a car after the driver failed to properly signal a lane change. Martinez was a passenger in the vehicle. Trooper Horne explained the reason for the stop and asked the car's driver for his license, vehicle registration, and proof of insurance. While the driver was collecting his documents, Trooper Horne also asked Martinez for identification.

¶3  Trooper Horne gathered documentation from both the driver and Martinez and returned to his patrol car. He conducted a records check of both the driver and passenger using his in-car computer system. He entered the driver's driver license number first and then immediately entered Martinez's driver license number. According to Trooper Horne, after entering a number, it generally took "less than five seconds or so" to retrieve information regarding warrants, license status, and a photo. Trooper Horne first learned that the driver's license was valid and that the driver had no outstanding warrants. "Immediately after" that, Trooper Horne reviewed Martinez's inquiry results and learned that Martinez had an outstanding arrest warrant.

¶4 Trooper Horne returned to the car—now two to three minutes into the stop—and arrested Martinez. When Trooper Horne asked Martinez if he had anything illegal on his person, Martinez admitted that he did and produced a glass pipe, which later tested positive for methamphetamine residue. After Martinez's arrest, Trooper Horne gave the driver a "verbal warning and allowed him to leave." The driver chose to stay, however, to help Martinez locate a battery for his hearing aid. The driver left twenty-two minutes after the initial stop.

¶5 The State charged Martinez with possession of a controlled substance and possession of drug paraphernalia. Martinez moved the district court to suppress the evidence Trooper Horne collected, arguing that the officer had violated his Fourth Amendment rights. Martinez claimed that "'[a]ny further temporary detention' for investigative questioning after fulfilling the original purpose for the traffic stop constitutes an illegal seizure, unless an officer has probable cause to arrest or a reasonable suspicion of a further illegality." (Quoting *State v. Hansen*, 2002 UT 125, ¶ 31, 63 P.3d 650). Because Trooper Horne asked for Martinez's identification without reasonable suspicion, Martinez argued, the information Trooper Horne obtained as a result of that illegal inquiry should be suppressed.

¶6 The district court granted Martinez's motion to suppress evidence after concluding that Trooper Horne had violated Martinez's Fourth Amendment rights when he asked to see Martinez's identification. It concluded that "[i]nvestigation of the passenger without reasonable suspicion of criminal activity is beyond the scope of a routine traffic stop."

¶7 The State appeals the district court's suppression order, arguing that an officer may ask a passenger to supply his identification and run a background check during a routine traffic stop as long as it does not unreasonably extend the stop's duration. The State's argument is consistent with United States Supreme Court precedent. We reverse and remand for further proceedings.

## STANDARD OF REVIEW

¶8 The district court's determination presents us with a mixed question of law and fact. We disturb the district court's findings of fact only when they are clearly erroneous. *See State v. Worwood*, 2007 UT 47, ¶ 12, 164 P.3d 397. But the deference we afford the district court's application of the law to those factual findings depends upon

> (1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on "facts" observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting [deference] to trial courts.

*Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 36, 308 P.3d 461 (alteration in original) (citation omitted).

¶9 In *Murray,* we suggested how we would apply that framework to a Fourth Amendment question. We opined that

> "a finding that a common set of recurring law enforcement practices qualifies as a 'reasonable' search or seizure" would warrant nondeferential review. Such a finding is "law-like" in that law enforcement and the general public need "a consistent rule established by set appellate precedent." And it is not "fact-like" because the ultimate determination will often rest on the "general reasonableness" of the facts rather than "the demeanor or credibility" of witnesses.

*Id.* ¶ 39 (citations omitted). We thus afford no deference to the district court's application of law to the underlying factual findings.

## ANALYSIS

¶10 This case presents a single issue: does a law enforcement officer violate the Fourth Amendment if she requests that a passenger voluntarily provide identification and then runs a background check on that passenger without reasonable suspicion that the passenger has committed—or is about to commit—a crime?[1]

---

[1] The State's opening brief framed the question presented as whether it is "reasonable under the Fourth Amendment for a police officer *to ask* to see a passenger's identification and run a background check during a routine traffic stop." (Emphasis added). In response to questioning at oral argument, the State asked us to decide whether officer safety concerns allow an officer *to demand* identification from

(continued . . .)

We conclude that an officer does not violate the Fourth Amendment if she does so. We recognize that the result we reach comports with that of a number of state and federal courts to have considered the issue.[2] And while the United States Supreme Court has never squarely addressed the issue before us, our holding aligns with the

---

a passenger in a vehicle during a routine traffic stop absent reasonable suspicion. We decline the State's invitation to address the propriety of a demand because that is not the question the district court addressed nor the question the State initially briefed. The district court analyzed this case as a request and not a demand. The district court concluded that "[i]t was beyond the permissible scope of a routine traffic stop for the trooper to run a warrants check on the passenger, Mr. Martinez. Moreover, it was unreasonable for the trooper to do so without at least some minimal suspicion that Mr. Martinez was involved in some kind of criminal activity." The court found that Trooper Horne "*asked for* and took" identification from Martinez, not that he *demanded* identification from Martinez. (Emphasis added). Moreover, the word *demand* appears nowhere in State's opening brief. The State doubles down in its reply brief, explaining that "[t]he issue in this case is straightforward: Is *requesting* to see a passenger's identification and then running a criminal background check a reasonable safety precaution during a traffic stop?" (Emphasis added). It then clarifies, "[f]irst, Trooper Horne did not demand Defendant's identification; he merely asked if he could see it." In response to Martinez's briefing, the State's reply brief does argue that even if Trooper Horne did not demand Martinez's compliance, he could have. But that is not enough to persuade us to accept the invitation the State extended at oral argument to reframe the question and decide an issue that the district court did not rule on and the State did not address in its opening brief.

  [2] Some state courts have ruled that their state constitutions prohibit officers from questioning passengers in stopped vehicles absent reasonable suspicion. *See, e.g.*, *Commonwealth v. Alvarez*, 692 N.E.2d 106, 109 (Mass. App. Ct. 1998); *State v. Thompkin*, 143 P.3d 530, 534 (Or. 2006); *State v. Rankin*, 92 P.3d 202, 207 (Wash. 2004) (en banc). Martinez has not argued that Utah's state constitution affords the people of Utah more robust protections in this instance than the federal constitution.

analysis the Court employs when discussing the legitimacy of taking steps to promote officer safety during a traffic stop.

¶11 The Fourth Amendment provides that "the people [shall] be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Thus, it "is not . . . a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985).

¶12 To decide whether police conduct during a traffic stop is reasonable, we consider whether the stop was (1) "justified at its inception" and (2) carried out in a manner "reasonably related in scope to the circumstances [that] justified the interference in the first place." *Id.* at 682 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). An otherwise lawful traffic stop can become unreasonable "if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

¶13 Here, Martinez does not argue that the traffic stop was not justified at its inception. Instead, Martinez contends that Trooper Horne was required to have a "reasonable suspicion that [Martinez was] involved in criminal activity" and that the trooper's conduct "impermissibly added to the time reasonably necessary to complete the traffic check." We thus consider the facts of Martinez's case through current Supreme Court precedent with an eye toward both the scope and duration of the traffic stop.

¶14 We begin by underscoring that reasonable officer safety measures are related to the mission—and therefore to the scope—of a traffic stop itself. In *Rodriguez v. United States*, the Supreme Court explained,

> Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to [1] address the traffic violation that warranted the stop and [2] attend to related safety concerns.

135 S. Ct. 1609, 1614 (2015) (citations omitted). The Court reiterated that "the government's officer safety interest stems from the mission of the stop itself," because "[t]raffic stops are 'especially fraught with danger to police officers.'" *Id*. at 1616 (citation omitted); *see also*

*Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("Regrettably, traffic stops may be dangerous encounters."). "Indeed, it appears 'that a significant percentage of murders of police officers occurs when the officers are making traffic stops.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (citation omitted). Thus, in *Maryland v. Wilson*, the Court repeated that it is "too plain for argument" that officer safety is "both [a] legitimate and weighty" concern. 519 U.S. at 412 (citing *Mimms*, 434 U.S. at 110).

¶15 The Supreme Court further stated that because "[t]raffic stops are 'especially fraught with danger to police officers,'" officers may "need to take certain negligibly burdensome precautions in order to complete [their] mission[s] safely." *Rodriguez*, 135 S. Ct. at 1616 (citations omitted); *cf. Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016) ("While [an officer's] decision to initiate the stop was mistaken, his . . . decision to run the warrant check was a 'negligibly burdensome precautio[n]' for officer safety." (second alteration in original)). For example, the Court has held that an officer may require all occupants of a vehicle to stand outside the car during a stop to minimize access to firearms that could be concealed in the car. *See Wilson*, 519 U.S. at 413. To reach that conclusion, the Court reasoned that "the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger." *Id*. It explained that

> the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*Id*. at 414. This conclusion is premised on the assumption that officers may uncover evidence of a passenger's "more serious crime" during the course of the stop. Thus the Court concluded "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." *Id*.[3]

---

[3] Although the issue was not squarely before the Court in *Rodriguez v. United States*, there the Court did not avail itself of an opportunity to suggest that background checks of passengers violate

(continued . . .)

¶16 Many circuit courts have relied on these principles to determine that an officer may request to see a passenger's identification and run a background check. The Tenth Circuit explained that "because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (citation omitted); *see also State v. Martynowicz*, No. 109, 056, 2013 WL 5303557, at *5 (Kan. Ct. App. Sept. 30, 2013) (citing *Rice* and allowing an officer to request a passenger's identification); *Cortes v. State*, 260 P.3d 184, 190 (Nev. 2011) (same). The Fourth Circuit similarly reasoned that "[i]f an officer may 'as a matter of course' and in the

---

the Fourth Amendment. 135 S. Ct. 1609 (2015). In *Rodriguez*, a canine handling officer pulled over Rodriguez and his passenger. *Id.* at 1613. The officer collected Rodriguez's identification and ran a background check on him. *Id.* After returning to the vehicle, the officer

> asked [the passenger] for his driver's license and began to question him about where the two men were coming from and where they were going. . . . [The Officer] returned again to his patrol car, where he completed a records check on [the passenger], and called for a second officer.

*Id.* The officer asked Rodriguez "for permission to walk his dog around Rodriguez's vehicle." *Id.* "Rodriguez said no," but the canine officer led his dog around the car anyway, and the dog alerted to the presence of narcotics in the vehicle. *Id.* A search of the vehicle revealed methamphetamine. *Id.* In determining that the stop was illegally prolonged to accommodate a dog sniff "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" *id.* at 1615 (alteration in original) (citation omitted), the majority opinion failed to mention at all—even in a footnote—the prolongation that resulted because of the officer's separate background check of the passenger. Justice Alito's dissenting opinion, however, noted that the officer collected the passenger's driver license. Justice Alito drew attention to this fact, reciting that the officer "called in the information needed to do a records check on [the passenger] (a step that the Court recognizes was properly part of the traffic stop)." *Id.* at 1624 (Alito, J., dissenting). The majority did not respond to Justice Alito's observation.

interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) (citations omitted). The Fifth Circuit likewise concluded that "[a]n officer may ask for a driver's license and registration of the *occupants* and may run a computer check on both." *United States v. Jenson*, 462 F.3d 399, 403–04 (5th Cir. 2006) (emphasis added). *See also United States v. Diaz-Castaneda*, 494 F.3d 1146, 1153 (9th Cir. 2007) ("[The officer] was therefore free to ask [the passenger] for identification without implicating the Fourth Amendment."); *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009) (finding than an officer's inquiry into the passenger's identity "did not measurably extend the duration of the stop," and that any delay "was independently warranted by the officer's reasonable suspicion, based on [the passenger]'s implausible answers and nervous demeanor").

¶17 Martinez cites *United States v. Henderson* as support for his assertion that the First Circuit has departed from this trend. 463 F.3d 27, 45–47 (1st Cir. 2006) (refusing to recognize an officer's ability to *demand* identification in every instance). However, three years after *Henderson*, the First Circuit relied on the Supreme Court's rationale and precedent to recognize an officer's ability to inquire into a passenger's identity without reasonable suspicion. "Noting the inherent dangers of a traffic stop," the First Circuit explained,

> the Supreme Court has allowed officers to, as a matter of course, take the arguably more intrusive step of ordering passengers out of a vehicle during a valid traffic stop without any individualized suspicion or justification. More recently, the Supreme Court emphasized that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."

*Chaney*, 584 F.3d at 26 (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). The First Circuit held that "the officer's initial inquiries into [the passenger's] identity took at most a minute or two and did not measurably extend the duration of the stop." *Id*. It concluded that the officer's "initial few questions concerning [the passenger's] identification were allowable officer safety measures, not themselves

requiring any individualized suspicion of [the passenger], but rather justified based on the inherent dangers of the motor vehicle stop and the officer's need to orient himself to who and what he may be dealing with." *Id*. at 27.

¶18  The other two cases Martinez cites to support his arguments do not persuade us to part company with the vast majority of courts that have considered the question. The Massachusetts case Martinez cites determined that "[i]nterrogation of passengers in a car stopped for a traffic offense, without an objective basis for suspicion that the passenger is involved in criminal activity, slips into the dragnet category of questioning that art. 14 [of Massachusetts's State Constitution] prohibits." *Commonwealth v. Alvarez*, 692 N.E.2d 106, 109 (Mass. App. Ct. 1998). As evident from the quoted language, the Massachusetts Court of Appeals analyzed Massachusetts's state constitution, not the Fourth Amendment. The New Mexico Court of Appeals' holding in *State v. Affsprung* was, in contrast, decided under the federal constitution. 87 P.3d 1088, 1094–95 (N.M. Ct. App. 2004). There, the court of appeals determined that officers may not request passenger identification and run a background check because "this generalized [officer safety] concern, without more, is [in]sufficient to override reasonable Fourth Amendment privacy considerations of passengers." *Id*. We believe its decision is out of step with the interpretive framework dictated by United States Supreme Court precedent.

¶19 Having recognized that certain measures promoting officer safety fall within the permissible scope of a traffic stop, we conclude that Trooper Horne's voluntary interaction with Martinez did not violate Martinez's Fourth Amendment rights.[4] We next consider

---

[4] Although it may seem somewhat blithe to characterize an interaction between an officer and a passenger in a stopped car as voluntary, that characterization squares with the facts the district court found and the way in which the United States Supreme Court has described similar interactions. The district court found that Trooper Horne "asked" Martinez for his identification. Trooper Horne testified, "There was a passenger and I asked if I could see his ID, which he supplied." Martinez testified similarly: "He asked for my ID and I gave it to him."

(continued . . .)

whether Trooper Horne's questioning and background check of Martinez unreasonably extended the stop in question.

¶20 The record reflects that running Martinez's background check prolonged the stop by anywhere from one to five seconds. Martinez contends that this extension "impermissibly added to the time reasonably necessary to complete the traffic stop." But the evidence does not support that contention.

¶21 Trooper Horne offered the only testimony as to how long it took to run Martinez's background check:

> Q:     How long, once you've entered that license number into the field and hit enter does it take to get the information that you've just described; the warrants check, the license status and a photo?
> A:     Usually less than five seconds or so.

---

The United States Supreme Court has held that the Fourth Amendment "does not proscribe voluntary cooperation." *Florida v. Bostick*, 501 U.S. 429, 439 (1991) (concluding there was no seizure when two officers boarded a bus and asked a passenger's consent to search his bags). Interaction with the police is deemed voluntary as long as "the police do not convey a message that compliance with their requests is required." *Id.* at 435.

*Muehler v. Mena* is instructive. 544 U.S. 93 (2005). There, the Supreme Court considered the questioning of Mena, a woman "detained in handcuffs during a search of the premises that she and several others occupied." *Id.* at 95. Immigration and Naturalization Service (INS) officers present at the scene questioned Mena regarding her "name, date of birth, place of birth, and immigration status." *Id.* at 96. The Supreme Court explained that it has "held repeatedly that mere police questioning does not constitute a seizure." *Id.* at 101; *see, e.g.*, *United States v. Mendenhall*, 446 U.S. 544, 555 (1980) (holding that where police "requested, but did not demand to see the respondent's identification and ticket[,] . . . . [s]uch conduct without more, did not amount to an intrusion upon any constitutionally protected interest"). Thus, "the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status." *Muehler*, 544 U.S. at 101.

> Q: And you ran the passenger's information before or after the driver's information?
> A: After.
> . . .
> [T]he way our system works is you type in the [driver license number], hit enter, and I immediately type in the other one and hit enter, and then review the inquiry results. So I did review the driver's first and then I reviewed the passenger's immediately after and saw that he had a warrant.

Trooper Horne testified that he received Martinez's information "immediately" after receiving the driver's information. He also testified that, usually, after entering a driver license number, the database took "less than five seconds or so" to retrieve the information.

¶22 In *State v. Simons*, we considered the parameters of a reasonable extension when an officer's questioning prolonged a traffic stop. 2013 UT 3, 296 P.3d 721. There, we noted the Supreme Court's lack of guidance in "elucidat[ing] the length of time" that would qualify in order to determine that a stop had been "measurably extend[ed]." *Id.* ¶ 30. We also noted that other federal jurisdictions had weighed in on the issue and found that an extension of mere seconds was reasonable. *See id.* ¶ 31; *see United States v. Everett*, 601 F.3d 484, 495–96 (6th Cir. 2010) (holding that a single question "taking up several seconds . . . . did not render the traffic stop an unreasonable seizure under the Fourth Amendment"); *United States v. Dixie*, 382 F. App'x 517, 519–20 (7th Cir. 2010) (holding that an officer's question regarding weapons that took "only seconds" did not "unreasonably prolong[] the duration of the stop"). The First Circuit sanctioned an extension of "a minute or two" for an officer's "initial inquiries into [a passenger's] identity." *Chaney*, 584 F.3d at 26. And the Eleventh Circuit sanctioned a three-minute extension while the officer was requesting "criminal histories." *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001) ("[T]he duration of the traffic stop did not violate the Fourth Amendment."). *See also United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010) ("The one to two of the [eleven] minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern."). By contrast, traffic stop extensions that have been deemed unreasonable have involved longer detentions

than the extra seconds at issue here. *See, e.g.*, *United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (finding that "six minutes of questioning" unreasonably extended "the traffic stop beyond its original purposes because the topics covered more than just context-framing questions and the extraneous questions lasted a not insubstantial amount of time"); *Rodriguez*, 135 S. Ct. at 1616 (finding that the delay of seven to eight minutes unlawfully prolonged the stop).

¶23 Here, the extension lasted anywhere from one to five seconds. Trooper Horne testified that from the time he hit enter until he received the requested information on any given search was about five seconds. He testified that, in the instant case, he received Martinez's information "immediately" after receiving the driver's information. He explained, "I did review the driver's first and then I reviewed the passenger's immediately after and saw that he had a warrant." Trooper Horne further testified that, "from the time that [he] had pulled the car over until the time that [he was] arresting [Martinez] on his warrant," only "two to three minutes" had lapsed. This scenario is easily distinguishable from the scenario the Supreme Court considered in *Rodriguez*. There, the officers performing the dog sniff extended the traffic stop by seven to eight minutes. *Id.* at 1613. Furthermore, the extension in *Rodriguez* took place after the mission of the stop had been concluded. *Id*. We do not believe that Trooper Horne's five-second extension unreasonably prolonged the length of time of this traffic stop. And because the extension flowed from Martinez's voluntary compliance with Trooper Horne's request, it was also not a "burdensome precaution," as precautions go. Furthermore, the stop was legitimately extended as part of the stop's "'mission'—to [1] address the traffic violation that warranted the stop, and [2] attend to related safety concerns." *Id.* at 1614. (citations omitted). Within the framework of officer safety concerns, running Martinez's background was a "negligibly burdensome precaution[]" that Trooper Horne was justified in taking. *See id.* at 1616.

¶24 Finally, Martinez argues that "adopting the State's argument would require this Court to overrule" *State v. Johnson*, 805 P.2d 761 (Utah 1991), *State v. Hansen*, 837 P.2d 987 (Utah Ct. App. 1992), and *State v. Chism*, 2005 UT App 41, 107 P.3d 706. All three cases turned on whether an officer could articulate reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968)—and none of them presented the question of whether safety concerns permitted an

officer to ask a passenger for identification and run a warrants check. *State v. Chism* considered the reasonableness of the officer's suspicion. 2005 UT App 41, ¶ 17 ("Chism's state-issued driver license dispelled the *reasonableness* of any suspicion that [the officer] may have had about Chism's age."). *State v. Hansen* held that once the purpose of the traffic stop is dispelled, "any further detention is permissible only if the officers have a reasonable articulable suspicion of criminal activity." 837 P.2d at 989. In *State v. Johnson*, we overturned the court of appeals because we determined that the officer did not have reasonable suspicion that defendant had committed a crime. 805 P.2d at 764. The officer in *Johnson* ran a warrants check on a vehicle's passenger because the driver did not possess identification, which caused him to believe the car had been stolen and that a warrants check on the passenger might reveal a warrant for a crime involving stolen vehicles. *Id.* at 763. We were not asked whether safety concerns would have permitted a negligibly burdensome warrant check, and, in fact, we specifically noted that *Johnson* was not "a case where an officer detains a passenger in a stopped vehicle because of safety concerns." *Id.* at 764. These cases do not prevent us from joining the multitude of other courts that have held that, to promote officer safety, the Fourth Amendment does not prevent an officer from asking a passenger to produce identification and running a warrants check as long as that does not unreasonably prolong the duration of the stop.

## CONCLUSION

¶25 Trooper Horne's request for Martinez's identification did not violate Martinez's Fourth Amendment rights under the United States Constitution. An officer may request that a passenger provide identification. Here, Trooper Horne's seconds-long extension of a lawful traffic stop did not unreasonably prolong the detention. We reverse the decision of the district court and remand for proceedings consistent with this opinion.

14