**UNITED STATES of America,**

**v.**

**Jacorey SANDERS, Defendant.**

**Cr. No. 16–059 S**

United States District Court, D. Rhode Island.

April 3, 2017

Terrence P. Donnelly, U.S. Attorney's Office, Providence, RI, for Plaintiff.

Tara I. Allen, Federal Public Defender Office, Providence, RI, for Defendant.

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

Defendant Jacorey Sanders has been indicted for one count of knowingly and intentionally possessing a firearm in violation of 18 U.S.C. § 922(g)(1). (Indictment ¶ 1, ECF No. 8.) The Defendant moves to suppress two handguns seized from his coat pocket during the traffic stop that preceded his arrest. (Def.'s Mot. to Suppress, ECF No. 20.) For the reasons set forth herein, the motion is DENIED.

### I. Background

On April 30, 2016, at approximately 11:50 p.m., Rhode Island State Police Troopers Conor O'Donnell and Tyler Denniston were traveling south on Interstate 95 when their police cruiser pulled up parallel to a brown Nissan Murano. (Hr'g Tr. 5:1-6:19.) The troopers noticed that the front-seat passenger was not wearing a seatbelt, so they pulled behind the vehicle and activated their overhead lights. (Id. at 6:18–23.) As the vehicle began to slow down, both troopers noticed that the back-seat passenger (the Defendant) abruptly moved from the rear-passenger seat to the rear-middle seat of the vehicle. (Id. at 7:3–5.) The vehicle traveled in the breakdown lane for approximately fifty yards before coming to a complete stop. (Id. at 7:19–24.)

Trooper O'Donnell approached the vehicle and began discussing the traffic infraction with the vehicle's occupants; he observed that the driver appeared "very nervous" and held the steering wheel very tightly throughout the conversation. (Id. at 9:2–4, 10:14–19.) Trooper O'Donnell also noticed the "very strong" odor of both recently burnt and fresh marijuana coming from the vehicle. (Id. at 11:10–12,

11:24–12:5, 13:7–9.) In addition, the trooper, using his flashlight, saw a small marijuana cigarette in an ashtray cup holder located in the center console of the vehicle. (Id. at 12:9–14.) The front-seat passenger confirmed that they had recently smoked marijuana when Trooper O'Donnell asked about the smell. (Id. at 11:15–23.) During this time, Trooper O'Donnell observed the front-seat passenger's hands tucked under his coat; the passenger complied with the trooper's request to remove them and make them visible. (Id. at 13:12–16.) While collecting identification from the occupants, Trooper O'Donnell noticed that the Defendant, who was seated in the back seat, was oddly fixated on his phone's GPS program, that he seemed "disinterested" in the stop, and that he was wearing only a muscle shirt while his jacket was across his lap; both troopers testified that it was relatively cold outside that night.[1] (Id. at 6:9, 14:6–21.) Trooper O'Donnell later testified that the occupants "displaying signs of nervousness and disinterest in the stop" led him "to believe that something may be going on within the car." (Id. at 13:21–25.)[2]

Both troopers returned to the police cruiser to conduct standard law enforcement checks on the occupants; these included checking the validity of the produced licenses and checking for any possible outstanding warrants. (Id. at 16:23–25.) Trooper O'Donnell testified that it took him approximately five to ten seconds to input the information for this check, and that the results came back "almost instantaneous[ly]." (Id. at 17:7–8, 18–19.) There were no outstanding warrants for any of the occupants, and the driver had a valid license. (Id. at 18:17–19:1.) The troopers then ran a criminal background check through the BCI/III program, which also took approximately five to ten seconds per person to input the information. (Id. at 17:20–18:3.) The results, which also came back "almost instant[ly]," indicated that all three occupants had significant criminal histories, and that Defendant's history in particular included violent crimes. (Id. at 18:12–14, 19:2–22.) Based on the results of the criminal background check and the behavior of the occupants during the stop, the troopers decided to call other troopers to assist at the scene. (Id. at 23:23–24.) At this point, the troopers had not issued a traffic citation or indicated to the occupants whether there would be a citation at all. (See id. at 23:15–18.) Trooper O'Donnell testified that both types of inquiries, for all three individuals, took approximately five to ten minutes total. (Id. at 99:5–6.)

Trooper O'Donnell and Trooper Denniston then approached the vehicle and Trooper Denniston asked the driver to exit while Trooper O'Donnell stood at the rear driver side door's bumper. (Id. at 25:6–11.) When the driver opened his door, Trooper O'Donnell saw a "large clear plastic baggie containing a greenish brown leafy substance, which [he] believed to be marijuana, in the lower driver side door pocket." (Id. at 25:14–17.) A Terry pat down of the driver's person yielded an illegal weapon; the driver was immediately taken into cus-

---

**1.** Trooper O'Donnell testified that he was wearing a long-sleeve Under Armor shirt under his uniform, and the other occupants of the vehicle were also wearing warmer clothing that night. (Hr'g Tr. 15:12–16.)

**2.** Trooper O'Donnell testified that the "three occupants in the car displayed signs of over-nervousness that you wouldn't see for just a simple traffic violation, and it made [him] wonder what was going on within the interior of the car, whether there was further contraband that they didn't want to be found, narcotics or guns, drugs, weapons, whatever it may be." (Hr'g Tr. 16:11–20.)

tody. (Id. at 29:18–21.) Shortly thereafter, additional troopers arrived to the scene, id. at 30:1–5, then Troopers Denniston and O'Donnell asked the front seat passenger and the Defendant to exit the vehicle. (Id. at 30:6–9.) A Terry pat down of both individuals did not yield any weapons. (Id. at 30:10–16.) Trooper O'Donnell then seized the clear plastic baggie from the driver's door side pocket and the cupholder from the center console. (Id. at 31:12–14.) From the front passenger's door side pocket, Trooper O'Donnell seized a "small clear plastic baggie" with marijuana inside it. (Id. at 31:15–19.) Then, from the backseat, Trooper O'Donnell lifted the jacket previously held by the Defendant but left in the car when he exited the vehicle. (Id. at 30:19–31:2, 31:21–23.) Trooper O'Donnell testified that "the coat was very heavy, heavier than a normal winter coat, and [he] heard the distinct sound of two objects that were metal clinking together. (Id. at 31:23–32:1.) He found two pistols in one pocket. (Id. at 32:2–4.) The Defendant and the front seat passenger were then taken into custody before Trooper O'Donnell continued his search of the jacket and found several rounds of ammunition in another pocket; he also discovered that the pistols were fully loaded with ammunition. (Id. at 32:5–13, 36:1–3.) In addition, Trooper O'Donnell seized suspected crack cocaine from the rear pocket of the front passenger seat. (Id. at 38:20–22.)

II. Discussion

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." U.S. Const. Amend. IV. A traffic stop, even if brief and for a limited purpose, constitutes a "seizure" under this provision.[3] See Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). This protection is not only afforded to the driver of the vehicle, but also extends to the vehicle's occupants. See Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); Prouse, 440 U.S. at 653, 99 S.Ct. 1391. In order to be "reasonable" under the Fourth Amendment, the officer's detention must be supported by "probable cause to believe that a traffic violation has occurred," Whren, 517 U.S. at 810, 116 S.Ct. 1769, or "reasonable suspicion of unlawful conduct involving a motor vehicle or its operation," United States v. Jenkins, 680 F.3d 101, 104 (1st Cir. 2012). See also United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).

■ During a lawful traffic stop, the law enforcement officer may order the driver and the occupants out of the vehicle. United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (citing Maryland v. Wilson, 519 U.S. 408, 410, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)). The officer may conduct a Terry frisk of the driver's person or the other occupants for weapons "if he has some articulable, reasonable suspicion that the persons stopped may be dangerous." Id. In addition, the officer may "search the car's interior—including closed compartments—for weapons that they could quickly lay their hands on." Id. (citing Michigan v. Long, 463 U.S. 1032, 1037, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

■ Moreover, the First Circuit has held that "when a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passen-

---

**3.** Standing to challenge the search is satisfied, as the Defendant was a passenger in the vehicle. See Brendlin v. California, 551 U.S. 249, 251, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (holding "that a passenger is seized as well [as the driver] and so may challenge the constitutionality of the stop").

ger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area." United States v. Staula, 80 F.3d 596, 602 (1st Cir. 1996) (stating that the search "may encompass all areas of the vehicle in which the suspected contraband is likely to be found"). If, while conducting a lawful search of a vehicle, the officers discover contraband, that evidence provides the officers probable cause to continue searching the vehicle for further contraband. Id. at 603.

■ Finally, if the driver of the vehicle is arrested during the stop, the officers may conduct a search of the vehicle incident to a lawful arrest. Id. However, a search incident to a lawful arrest for weapons may only extend to places within the grab area of the suspect while the suspect is unsecured, or for evidence of the crime of arrest if there is a "reasonable basis to believe the vehicle contains relevant evidence." Arizona v. Gant, 556 U.S. 332, 343, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

■ In this motion[4], the Defendant argues that the two pistols seized during the search should be suppressed because (1) the criminal background checks conducted by the law enforcement officers were not reasonably related to the mission of the traffic stop; and (2) that once the license and warrant checks were completed, each of the troopers' subsequent actions constituted a criminal investigation for which they did not have an independent lawful basis. (Def.'s Mot. to Suppress 9, 12.) The Defendant specifically contends that neither the vehicle's occupants' criminal histories, their behavior during the stop, or the odor of marijuana detected during the initial stage of the traffic stop provided "rea-

sonable suspicion that criminal activity was afoot." (Id. at 12, 15, 16.) The Defendant also argues that running the BCI/III check, the call for back-up, and ordering the occupants out of the vehicle impermissibly extended the duration of the traffic stop beyond that which was required to address the seatbelt violation. (Id. at 11–12.)

The Government argues that the BCI/III criminal background checks did not require additional justification in terms of relatedness to the traffic stop, or additional reasonable suspicion, because they are "safety measures" that have been "repeatedly recognized and validated [by the courts] given the inherent dangers of a traffic stop." (Gov't Resp. in Opp'n 1–2, 10, ECF No. 24.) Moreover, even if the criminal background check required additional justification, the Government argues that there was sufficient evidence, considering the totality of the circumstances, which gave rise to reasonable suspicion for extending the traffic stop. (Id. at 3.) The Court will address each of the Defendant's arguments in turn.

A. Criminal Background Checks

■ The first issue is whether the BCI/III criminal background check was reasonably related to the mission of the traffic stop or whether it required some additional justification. When determining the permissible duration of a traffic stop under the Fourth Amendment, courts must consider the "mission" of the traffic stop as well as an officer's need to "attend to related safety concerns." Rodriguez v. United States, —— U.S. ——, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)). A

4. The Government bears the burden of proving a warrantless search or seizure was "reasonable" under the Fourth Amendment. See

United States v. Arias, 588 F.Supp.2d 237, 239 (D.R.I. 2008).

traffic stop may not last longer than what is reasonably necessary to effectuate the purpose of the stop, including addressing the traffic violation that warranted the stop. Id. Police officers may, however, conduct "certain unrelated checks during an otherwise lawful traffic stop," as long as the stop is not prolonged or measurably extended. Id. at 1615. The Supreme Court in Rodriguez distinguished measures taken in the interest of "highway and officer safety" from those measures taken "to detect crime in general or drug trafficking in particular," and held that the duration of the stop and the purpose of the extension are both critical in determining whether additional justification is required under the Fourth Amendment. Id. at 1612, 1616.

Even prior to Rodriguez, courts have recognized the distinction between a criminal background check performed as part of a "routine computer check," and a background check performed after the officer addressed the objective of the traffic stop. See United States v. Boyce, 351 F.3d 1102, 1106, 1107 (11th Cir. 2003) (stating that "out of interest for the officer's safety ... officers may permissibly prolong a detention while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation").

While the First Circuit has not confronted this particular issue, most courts that have addressed the question have held that police officers are permitted to conduct criminal background checks in the interest of officer safety without demonstrating additional justification under the Fourth Amendment. See, e.g., United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) ("The request for criminal histories as part of a routine computer check is justified for officer safety")[5]; United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001), overruled on other grounds by United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007), ("The justification for detaining a motorist to obtain a criminal history check is, in part, officer safety.")[6]; United States v. McRae, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996) ("[t]riple I checks are run largely to protect the officer" and "the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive"); United States v. Crain, 33 F.3d 480, 485 (5th Cir. 1994). And while the Seventh Circuit did not ultimately adopt this approach in a case brought 20 years ago, it acknowledged "support for the argument that requesting a criminal history check is a reasonable, constitutional part of all or most traffic stops." United States v. Finke, 85 F.3d 1275, 1280 (7th Cir. 1996). The court stated that it would have allowed this approach if "technology permit[ted] criminal record requests to be conducted reasonably contemporaneously with the license and warrant checks normally solicited." Id.

5. The court went on to note that the background check is "both reasonable and minimally intrusive. Indeed, in most cases, the occupants of the car will not even know what information has been requested as part of the computer check." United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001).

6. The court commented that "the motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history." United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (emphasis added). The court also noted that "[b]y determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop." Id. at 1221–22.

The Defendant relies on a Ninth Circuit case which held that, when the officer has already completed the mission of the traffic stop, additional criminal background checks and investigatory steps are not permissible because the stop becomes unreasonably extended. United States v. Evans, 786 F.3d 779, 787, 788 (9th Cir. 2015) (noting that the criminal background check almost doubled the overall duration of the traffic stop, the K–9 drug sniff was completely unrelated to the traffic violation, and both steps were undertaken after the officer had completed all tasks related to the traffic infraction).

While Evans clearly puts some limits on how far officers may go in conducting background checks, those limits are dependent on the context of the stop. In Evans, the purpose of the stop was completed before the check; here, by contrast, the stop had just commenced. Both troopers testified that each BCI/III check took approximately ten to fifteen seconds total because the results of the background checks came back almost instantaneously. (Hr'g Tr. 18:1–3, 9–14, 110:13–15.) Consistent with the holdings noted above, this Court finds that the criminal background checks performed by Trooper O'Donnell during the traffic stop on April 30, 2016 did not extend the detention beyond the time needed to address the reason for the stop; moreover, the checks were done in the interest of officer safety. Therefore, the checks did not unreasonably extend the duration of the stop and required no additional justification; they were permissible under the Fourth Amendment. See Rodriguez, 135 S.Ct. at 1616.

### B. Reasonable Suspicion to Continue the Investigation

This Court's conclusion that the criminal background checks performed by the troopers did not unreasonably extend the traffic stop effectively ends the Defendant's challenge to the stop. Based on the information received from the background check, the troopers were justified in ordering the driver out of the vehicle, whereupon Trooper O'Donnell saw the marijuana in the driver's door side pocket. A Terry pat down of the driver yielded the knife. The marijuana in plain view led to the lawful search of the interior of the vehicle, where drugs were found in the passenger door's side pocket, and the subject firearms were found in the Defendant's jacket. Given this, no additional totality of the circumstances determination of reasonable suspicion is required. Nevertheless, even if it were, the search would be permissible.

The Defendant specifically urges this Court to hold that courts should not consider the odor of marijuana in the reasonable suspicion analysis because the State of Rhode Island has decriminalized the possession of marijuana of one ounce or less. See R.I. Gen. Laws § 21–28–4.01(c)(2)(iii). And without this, the Defendant suggests, the circumstances do not create reasonable suspicion. This Court disagrees, and finds that, under the totality of the circumstances, the troopers did have reasonable suspicion in this situation.

The basic principles are as follows: law enforcement officers, when conducting a lawful traffic stop, may extend the duration of the detention for reasons other than those related to the mission of the traffic stop where the basis for the extension is supported by an officer's reasonable suspicion of ongoing criminal activity. See Chhien, 266 F.3d at 6. This determination by the officer is one that "demands a margin of flexibility" and can include the facts giving rise to the stop and everything the officer observed as the stop progresses. Id. "[W]hile an officer's actions must bear some relation to the purpose of the original stop, he may shift

his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Id. (citing United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998)).

Reasonable suspicion is present when, considering the totality of the circumstances, "there [is] both a particularized and an objective basis for suspecting the individual stopped of criminal activity." United States v. Dapolito, 713 F.3d 141, 148 (1st Cir. 2013). Particularity requires an officer's determination to be supported by "specific and articulable facts." Id. Objectivity requires a court's ad hoc analysis of the situation to be viewed "through the lens of a reasonable police officer." Id. Among the numerous factors that law enforcement officers may evaluate during an encounter, an important one is the presence of furtive or nervous behavior by the suspect during the lawful detention. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); Jenkins, 680 F.3d at 105, 106. Another factor is the smell of marijuana. Staula, 80 F.3d at 602 ("[W]hen a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area.").

The State of Rhode Island has recently passed legislation to "decriminalize" marijuana, changing the penalty from a criminal penalty to a civil infraction for possession of a less than one ounce. R.I. Gen. Laws § 21-28-4.01(c)(2)(iii). Based on this change, the Defendant argues that law enforcement officers should be precluded from considering the smell of marijuana when determining if reasonable suspicion

exists. (Def.'s Mot. to Suppress 16–17.) The Defendant cites to a case from the Supreme Judicial Court of Massachusetts for support. (Id. at 19–20.)[7] For starters, and to state the obvious, the decisions of the Supreme Judicial Court of Massachusetts do not bind this Court, particularly when there is a First Circuit case that is controlling on this issue. Moreover, the U.S. District Court for the District of Massachusetts declined to adopt the same rule as the state court, citing Staula. See United States v. Thompson, No. 12-10365, 2014 WL 108312, at *3 (D. Mass. Jan. 13, 2014) (holding that the odor of marijuana is still a relevant factor in the totality of the circumstances analysis). Furthermore, although it too would not be binding, the Rhode Island Supreme Court has not addressed this issue. For better or worse, and regardless of what the R.I. General Assembly has declared, possession of marijuana is still unlawful under federal law. See 21 U.S.C. § 841.

After reviewing the totality of the circumstances surrounding the traffic stop on April 30, 2016, the troopers had reasonable suspicion to believe criminal activity was ongoing from the first moments of the traffic stop: furtive behavior when the Defendant moved from one seat to another while the car was still in motion; the driver "firmly clenching the steering wheel" and acting "overly nervous" for a mere traffic stop; the odor of marijuana coming from the vehicle; the admission that they had smoked marijuana that evening; a small marijuana cigarette in plain view in the vehicle's ashtray; the Defendant's unusual behavior, feigning disinterest and fiddling with a GPS application on his cell phone; and the Defendant not wearing his jacket on a cool night. These

7. Commonwealth v. Cruz, 459 Mass. 459, 945 N.E.2d 899, 910 (2011) ("[T]he odor of burnt marijuana alone cannot reasonably provide suspicion of criminal activity to justify an exit order.").

observations properly led to the troopers' decision to take a few minutes to run the BCI/III checks, which revealed the extensive criminal histories of each of the vehicle's occupants. The BCI/III results provided additional support to continue the vehicle's detention while the troopers continued investigating their reasonable suspicion that criminal activity was ongoing, which led to finding the illegal drugs and the two pistols. In all, both troopers articulated more than enough specific facts to give rise to a reasonable suspicion of ongoing criminal activity.

III. Conclusion

For all of the reasons described above, the Defendant's Motion to Suppress (ECF No. 20) is DENIED.

IT IS SO ORDERED.