2019 UT App 18

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL J. MILLER,
Appellant.

Opinion
No. 20170084-CA
Filed January 31, 2019

Third District Court, Silver Summit Department
The Honorable Paige Petersen
No. 151500325

Cory A. Talbot, Tamara L. Kapaloski,
Dawn M. David, and Brandon T. Christensen
Attorneys for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGE JILL
M. POHLMAN concurred. JUDGE GREGORY K. ORME dissented,
with opinion.

HAGEN, Judge:

¶1     Michael J. Miller appeals the district court's denial of his
motion to suppress evidence of marijuana discovered during a
traffic stop. Miller entered a plea to one count of possession of a
controlled substance with intent to distribute, reserving the right
to appeal the denial of his motion to suppress. He argues that the
traffic stop was impermissibly prolonged without reasonable
suspicion when the officer conducting the traffic stop asked him
to walk back to the patrol car, engaged him in unrelated
questioning before and during the citation process, and waited

to run a records check until later in the stop. Because none of these actions unconstitutionally extended the stop, we affirm.

BACKGROUND[1]

*The Traffic Stop*

¶2     At 10:41 p.m., a Utah Highway Patrol Trooper (the officer) stopped Miller for driving seventy miles per hour on I-80, five miles per hour above the posted limit. After Miller gave the officer his driver license and the car rental agreement, the officer asked Miller to come back to his patrol vehicle. The officer testified that he asks drivers to come back to his patrol vehicle in 90% of traffic stops because he sometimes needs to gather additional information from drivers. In addition, by having Miller sitting in the passenger seat of the patrol vehicle and conversing with him, the officer "could try and gain suspicion while actively filling out a citation."

¶3     Miller followed the officer back to the patrol vehicle. Although Miller had a crutch with him and "was limping a little bit," the district court found that "it didn't take him an excessive amount of time to get back to the patrol [vehicle]." Once Miller was in the passenger seat, the officer stood at the passenger door and asked Miller, "What'd ya do to your ankle?" Miller told the officer how he came to be injured, and the officer asked no follow-up questions. Within one minute, the officer "was back on his side of the car and he began to fill out the citation."

¶4     Over the next seven minutes, the officer filled out the citation while conversing with Miller. The officer asked Miller

---

1. "We recite the facts in detail because the legal analysis in a search and seizure case is highly fact dependent." *State v. Warren*, 2003 UT 36, ¶ 2, 78 P.3d 590.

"some questions about his license and the car and where he rented it." But "the majority of the conversation was the defendant making conversation with the [officer] about various topics[,] such as children and marriage and relationships." In reviewing the dashboard camera recording of the conversation, the district court found that Miller initiated much of the conversation and that the questions the officer asked "did not take up much of that time." The court also credited the officer's testimony that "during this time he was filling out the citation."

¶5     After finishing all but one section of the citation, the officer informed Miller that he needed to call Miller's information into dispatch. In his testimony, the officer explained that the final section of the citation requires him to identify the offenses or traffic code violations committed and whether he will issue a ticket or a warning. The officer "leave[s] the violations part, the offenses part blank until [he hears] back from dispatch in case there's any other offenses that [he] might be adding to the citation." The district court accepted the officer's testimony that "he needed to hear back from dispatch before he could complete the citation."

¶6     The officer testified that, approximately eleven minutes after he officer initiated the stop, he called into dispatch for a "license records and criminal-history check." On the dashboard camera recording, an automated voice announces, "License is valid." The officer's statements to dispatch are largely inaudible, but he testified that he asked the dispatch operator to run a criminal-history or "Triple I" check, which he typically requests only when the driver has roused his suspicions. The parties also agree that the officer's request included a check for outstanding warrants. While waiting for dispatch to respond with additional information, the officer deployed his police service dog around Miller's car.

¶7     Approximately sixty seconds after the call to dispatch, the dog alerted the officer to the presence of a controlled substance.

Several minutes after the dog signaled the alert, dispatch responded with the results of the criminal-history check. A subsequent search of Miller's car uncovered seventy-one pounds of marijuana.

*Miller's Motion to Suppress*

¶8     The State charged Miller with one count of possessing a controlled substance with intent to distribute and one count of speeding. After a preliminary hearing at which the officer testified, Miller was bound over for trial.

¶9     Miller moved to suppress all evidence discovered during the search of his vehicle, arguing that the "search and seizure went well beyond the time necessary to conduct and conclude a routine traffic stop involving a speeding ticket for going 5 over." In support of the motion, Miller relied on the officer's testimony at the preliminary hearing and did not request an opportunity to present further evidence.

¶10     The district court denied the motion to suppress. In an oral ruling, the district court addressed "whether the unrelated investigations[,] which were some of the questioning and the dog search, . . . had the effect of extending [the] stop." First, the court concluded that the officer did not measurably extend the stop by conversing with Miller in the patrol vehicle. The court found that the officer "said much less than [Miller]" and the questions he did ask "were going on simultaneously with him filling out a portion of the citation."

¶11     Second, the court concluded that the dog sniff did not measurably extend the stop. Because the officer could not finish the citation until he heard back from dispatch on the records check, the court found that he could not have completed the mission of the traffic stop within the sixty seconds it took for the dog to alert the officer to the presence of drugs. The court also

rejected Miller's argument that it was impermissible for the officer to fill out a portion of the citation before calling dispatch:

> Is it possible that [the officer] could have shaved off some time if he had called dispatch first? It's possible, but that [would be] speculation on my part . . . . [And] that would basically be the Court holding that the [officer] has to call dispatch immediately upon getting back to his car. And that's micromanaging. That would be the Court telling the officer the order in which he has to perform the duties that are related to and permissible steps at a traffic stop.

The court concluded that the officer "was reasonably diligent in pursuing the mission of the traffic stop" and that "his unrelated questioning and the dog sniff did not measurably extend the stop, but took place during the time that he was conducting a permissible investigation that was related to the reason for the stop."

¶12    Following the denial of his motion to suppress, Miller pled guilty to possession of marijuana with the intent to distribute, reserving his right to appeal the district court's denial of his motion to suppress. He now appeals.

ISSUE AND STANDARD OF REVIEW

¶13    Miller contends that the district court erred in denying his motion to suppress the evidence discovered during the officer's search of his car. "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "While the court's factual findings are reviewed for clear error, its legal conclusions are

reviewed for correctness, including its application of law to the facts of the case." *Id.*

ANALYSIS

¶14 The Fourth Amendment to the United States Constitution protects citizens from "unreasonable searches and seizures." U.S. Const. amend. IV. [2] "[T]he 'touchstone of the Fourth Amendment is reasonableness,' which 'is measured in objective terms by examining the totality of the circumstances.'" *State v. Baker*, 2010 UT 18, ¶ 10, 229 P.3d 650 (alteration in original) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). In evaluating the reasonableness of a traffic stop, we assess whether the stop was "justified at its inception" and "reasonably related in scope to the circumstances that justified the interference in the first place." *Id.* ¶ 12 (quotation simplified). Miller does not challenge the justification for the stop because it is undisputed that the officer had probable cause to stop Miller for speeding.[3]

2. Miller also cites Article 1, Section 14 of the Utah Constitution, but he does not argue that the state constitution affords greater protection than the Fourth Amendment. To the extent he attempts to raise a separate argument based on the state constitution, he has inadequately briefed this argument. *See State v. Fuller*, 2014 UT 29, ¶ 50, 332 P.3d 937 (declining to review a state constitutional claim where the appellant's brief "contains bald citations to authority without development of that authority and reasoned analysis based on that authority" (quotation simplified)).

3. The dissent takes issue with the justification for the stop, citing the officer's testimony that he does not stop every driver going five miles per hour over the speed limit and that he primarily looks for "out-of-state plates" that "are huge with drug transportation." *See infra* ¶ 38. The officer's subjective motivation

(continued…)

Therefore, we must determine only whether the traffic stop, which was justified at its inception, was reasonable in duration and scope.

¶15    When a vehicle is pulled over for investigation of a traffic violation, "[t]he temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "If, during the scope of the traffic stop, the officer forms new reasonable articulable suspicion of criminal activity, the officer may also expediently investigate his new suspicion." *State v. Baker*, 2010 UT 18, ¶ 13, 229 P.3d 650. But "without additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded." *Id.*

¶16    Miller contends that the officer impermissibly prolonged the traffic stop without reasonable suspicion of additional

_____

(…continued)

for stopping Miller would have been relevant under the pretext doctrine, which examined "the detaining officer's state of mind [to] divine his or her true motives for making the stop." *State v. Lopez*, 873 P.2d 1127, 1137 (Utah 1994). However, in *Lopez*, the Utah Supreme Court rejected that doctrine, holding that "a traffic stop based on probable cause or reasonable suspicion that the driver has violated any one of the multitude of applicable traffic and equipment regulations is lawful under the Fourth Amendment," regardless of whether a reasonable officer "would have stopped the defendant for the traffic violation absent a desire to search for evidence of more serious crime." *Id.* at 1140 (quotation simplified). Because "the Fourth Amendment simply does not require an officer's state of mind to perfectly correspond to his or her legally justified actions," *id.* at 1137, the officer's reasons for making the stop are irrelevant where, as here, it is undisputed that the officer observed a traffic violation that objectively justified the stop.

criminal activity. Specifically, he argues that the officer extended the stop by asking him to walk back to the patrol car, engaging him in unrelated questioning before and during the citation process, and waiting to run a criminal-history check until later in the stop. The State does not contend that the officer had reasonable suspicion to extend the length of the stop to investigate other criminal activity. Therefore, we consider whether the officer's actions prolonged the time "reasonably required to complete" the mission of the traffic stop. *See State v. Martinez*, 2017 UT 43, ¶ 12, 424 P.3d 83 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

## I. Request to Accompany the Officer to the Patrol Car

¶17   Miller first contends that the officer unlawfully prolonged the stop by asking him to exit his vehicle and accompany the officer to the patrol car. "An otherwise lawful traffic stop can become unreasonable if it is prolonged beyond the time reasonably required to complete that mission." *State v. Martinez*, 2017 UT 43, ¶ 12, 424 P.3d 83 (quotation simplified). But the "mission" of a traffic stop is two-fold: "'to [1] address the traffic violation that warranted the stop and [2] attend to related safety concerns.'" *Id.* ¶ 14 (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)). Because traffic stops "are especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), an officer may "take certain negligibly burdensome precautions in order to complete his mission safely," *Rodriguez*, 135 S. Ct. at 1616.

¶18   In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam), the Supreme Court noted that officers face appreciable risks during traffic stops, such as being assaulted by a seated driver who can make unobserved movements or being injured by passing traffic. *See id.* at 110–11. Acknowledging "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties," the Court held that "once a motor vehicle has been lawfully detained for a traffic

violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment[]." *Id.* at 110, 111 n.6 (quotation simplified). Some circuits have interpreted this to mean that officers may also ask drivers to join them in the patrol vehicle. *E.g., United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (stating that "a reasonable investigation during a traffic stop may include . . . requesting the driver to sit in the patrol car" (quotation simplified)). According to the Supreme Court, when weighed against the "legitimate and weighty" concern for officer safety, the additional intrusion occasioned by asking lawfully seized drivers to exit their vehicles is "at most a mere inconvenience." *Mimms*, 434 U.S. at 110–11.

¶19  Here, Miller had been lawfully detained for speeding when the officer asked him whether they could walk back to the patrol vehicle together. Miller agreed to walk back to the patrol vehicle, assuring the officer that he was able to do so. Although Miller limped slightly, the district court found that "it didn't take him an excessive amount of time to get back to the patrol car." To the extent that the officer's request added any time to the stop,[4] we conclude it was a negligibly burdensome

---

4. According to the officer, he routinely asks drivers to accompany him to the patrol vehicle so he can complete the tasks associated with the traffic stop and "gather further information from them." By eliminating the need to walk back and forth between vehicles, the officer may have been able to complete his tasks more expeditiously. The officer also acknowledged that increasing his interaction with the driver may allow him to gain additional reasonable suspicion over the course of the stop. To the extent the officer may have had ulterior motives in asking Miller to join him in the patrol car, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification

(continued…)

precaution outweighed by the legitimate interests in officer safety. *See Rodriguez*, 135 S. Ct. at 1616.

¶20   Citing *Rodriguez*, Miller argues that officers may not ask drivers to step out of their vehicles unless safety is an actual concern because such a request detours from the officer's mission and unconstitutionally prolongs the stop. According to Miller, officers must develop reason to believe that they are in danger before they may take precautionary measures previously approved by the Supreme Court. To the contrary, *Rodriguez* emphasizes that, unlike a general interest in criminal enforcement, "the government's officer safety interest stems from the mission of the stop itself." *Id.* Additional reasonable suspicion is required only when the officer exceeds the scope of the traffic stop. *See State v. Baker*, 2010 UT 18, ¶ 13, 229 P.3d 650. Because "reasonable officer safety measures are related to the mission—and therefore to the scope—of a traffic stop itself," *Martinez*, 2017 UT 43, ¶ 14, the officer's request did not require additional reasonable suspicion that Miller posed a danger.

## II. Unrelated Questioning

¶21   Miller next contends that the officer detoured from the traffic stop's mission when he asked Miller questions unrelated to the traffic violation. The Supreme Court has held that officers may ask questions unrelated to the purpose of a traffic stop "so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding that because the officers' unrelated questioning did not prolong the detention, there was no additional seizure requiring independent

---

(…continued)

for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978).

reasonable suspicion). Therefore, the "critical question . . . is not whether the officer's [questions were] related to the purpose of the stop, but whether [those questions] prolonged—i.e., added time to—the stop." *See State v. Taylor*, 2017 UT App 89, ¶ 15, 402 P.3d 790. Here, Miller challenges the officer's unrelated questioning at two distinct points during the traffic stop—first, when the officer paused by the passenger door of the patrol car to ask about Miller's injury, and, second, when the officer asked about Miller's travel plans while completing the citation.

¶22    First, Miller argues that the officer measurably extended the stop by asking, "What'd ya do to your ankle?" But this single, casual inquiry did not unreasonably extend the stop. As our supreme court has recognized, a brief exchange of pleasantries, such as, "'How 'bout them Georgia Bulldogs?' does not implicate the Fourth Amendment, provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention." *State v. Simons*, 2013 UT 3, ¶ 32, 296 P.3d 721 (quotation simplified). The Fourth Amendment's reasonableness standard affords flexibility and "reasonable breathing space," which "leaves room for traffic stop extensions that are de minimis in length but not independently justified by reasonable suspicion." *Id.* ¶ 40 (Lee, J., concurring). "Otherwise, the constitution would be implicated by such commonplace acts as a police officer's small talk or rumination about the weather." *Id.*

¶23    Miller argues that *Rodriguez* abolished such a de minimis extension doctrine. But, as the Utah Supreme Court recognized even before *Rodriguez*, there is a distinction between a de minimis extension during a lawful detention and a de minimis extension once the purpose of the stop is completed. *Simons*, 2013 UT 3, ¶ 35. While a de minimis extension might be reasonable "at any point before the conclusion of an otherwise lawful detention, . . . 'once the lawful purpose of the stop has concluded, the occupants of the vehicle must be released from their temporary seizure.'" *Id.* (quoting *State v. Baker*, 2010 UT 18,

¶ 17, 229 P.3d 650); *see also State v. Martinez*, 2017 UT 43, ¶ 23, 424 P.3d 83 (distinguishing *Rodriguez*, in part, because "the extension in *Rodriguez* took place after the mission of the stop had been concluded"); *State v. Sosa*, 2018 UT App 97, ¶ 12, 427 P.3d 448 (distinguishing *Rodriguez* and *Baker* "because the request for a dog sniff and the resulting alert occurred during the traffic stop, not after its completion"). Because the authority for the seizure ends when the traffic stop is completed, even a de minimis extension constitutes an unlawful detention absent independent reasonable suspicion. *Simons*, 2013 UT 3, ¶ 35. But while a motorist is lawfully detained, the question is not whether the officer might have completed the stop in an incrementally more efficient manner, but whether the officer pursued his investigation in "a diligent and reasonable manner." *United States v. Sharpe*, 470 U.S. 675, 687 (1985). "'The touchstone of the Fourth Amendment is reasonableness.'" *Martinez*, 2017 UT 43, ¶ 11 (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). Reading *Rodriguez* as broadly as Miller suggests would eliminate the very flexibility the reasonableness standard affords.

¶24    Miller also contends that the officer extended the detention by asking questions unrelated to the stop while filling out the citation. Relying on *State v. Duhaime*, 2011 UT App 209, 258 P.3d 649, Miller argues that the officer's questions regarding his travel plans were unrelated to the traffic stop's mission and therefore unconstitutionally prolonged the detention. In *Duhaime*, this court suggested that questions about travel plans may "exceed the scope of a traffic stop because the objective of such questions is not to gain some insight into the traffic infraction providing the legal basis for the stop, but to uncover inconsistent, evasive or false assertions that can contribute to reasonable suspicion or probable cause regarding drugs." *Id.* ¶ 11 (quotation simplified). Because this court ultimately reversed on other grounds, those observations were dicta. And, under the facts presented here, there is no need to decide whether questions about the driver's travel plans go beyond the

purpose of a typical traffic stop. Even assuming that the officer's questions were unrelated to the purpose of the stop, they did not measurably extend the detention.

¶25 The United States Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." *Muehler*, 544 U.S. at 101 (quotation simplified). Therefore, where police questioning does not prolong an otherwise valid detention, no additional reasonable suspicion is required because "there [is] no additional seizure within the meaning of the Fourth Amendment." *Id.* In the traffic stop context, the Court has held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333. In other words, if there is no measurable extension of the traffic stop, no additional reasonable suspicion of criminal activity is needed to justify unrelated questions because those inquiries do not implicate the Fourth Amendment.

¶26 Here, the officer testified that he "always continue[d] to actively be working on the citation while . . . speaking with [Miller]."[5] The district court credited this testimony in finding that the officer's unrelated questioning "did not measurably extend the stop." Because the stop was not measurably extended, the officer's questions did "not convert the encounter into something other than a lawful seizure." *See id.*

---

5. Miller argues that "even the best multi-taskers will be distracted from their main task while engaging in a conversation." But the potential loss of efficiency while multitasking cannot be enough, standing alone, to impermissibly extend the stop; otherwise, the Supreme Court's holding in *Arizona v. Johnson*, 555 U.S. 323 (2009), would have no application.

## III. Records Check

¶27    Finally, Miller contends that the officer prolonged the stop by asking dispatch to conduct a records check, during which the officer conducted the dog sniff. "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quotation simplified). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[6] *Id.* These checks are part of the stop's mission because they "serve the same objective as enforcement of the

---

6. In *State v. Lopez*, 873 P.2d 1127 (Utah 1994), the Utah Supreme Court held that "running a warrants check during the course of a routine traffic stop does not violate the Fourth Amendment, so long as it does not significantly extend the period of detention beyond that reasonably necessary to request a driver's license and valid registration and to issue a citation." *Id.* at 1133. This holding was based on the concern that "[r]unning a warrants check without reasonable suspicion of criminal activity beyond the traffic offense itself arguably exceeds the reasonable scope of a traffic stop." *Id.* at 1132. *Rodriguez* has since clarified that checking for outstanding warrants is directly related to the mission of ensuring highway safety and is part of the stop itself. *See* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.3(c) (5th ed. 2018) (citing *Lopez* and other pre-*Rodriguez* cases but noting "that the Supreme Court in *Rodriguez v. United States* expressly approved determining whether there are outstanding warrants against the driver as a valid aspect of carrying out a traffic stop, given the fact that traffic stops are especially fraught with danger to police officers, which means such action is permissible even if it does prolong the traffic stop" (quotation simplified)).

traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* For example, a warrants check can "determine whether the apparent traffic violator is wanted for one or more previous traffic offenses," which serves "objectives sufficiently related to the initial reason for the stop, in much the same way as does the license/registration check." 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.3(c) (5th ed. 2018).

¶28 Although police may not "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff," *Rodriguez*, 135 S. Ct. at 1614, a dog sniff conducted during a lawful detention does not implicate the Fourth Amendment, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Because the records checks listed in *Rodriguez* are within the scope of a lawful traffic stop, a dog sniff that occurs while an officer is performing these checks does not require additional reasonable suspicion. *State v. Sosa*, 2018 UT App 97, ¶ 14, 427 P.3d 448 (holding that a dog sniff requested and performed before the officer completed a records check did not violate the Fourth Amendment).

¶29 Notwithstanding this authority, Miller contends that the traffic stop was extended beyond the time necessary to complete the stop's mission because, in addition to the routine record checks *Rodriguez* identified as mission-related, the officer requested a criminal-history check. But nothing in the record supports the assumption that but for the criminal-history check, the officer would have otherwise completed the "ordinary inquiries incident to the traffic stop" before the dog alert. *Rodriguez*, 135 S. Ct. at 1615 (quotation simplified). One of these ordinary inquires is "determining whether there are outstanding warrants against the driver." *Id.* Both Miller and the State agree that the records check the officer requested included a check for warrants. And although the officer testified that it might take a dispatcher several minutes to go through a lengthy criminal-history to determine what information was pertinent to the stop,

there was no testimony as to how long it typically takes to complete a warrants check alone. The district court found that the drug dog signaled an alert within sixty seconds after the officer contacted dispatch. Without evidence in the record that a warrants check would have been completed in less than sixty seconds, there is no basis to conclude that the officer's request for a more thorough criminal-history check prolonged the stop.

¶30    Miller also argues that, by not contacting dispatch at the outset of the stop, the officer manipulated the stop's order of operations to give himself "bonus time" to conduct the dog sniff. As an initial matter, the officer's subjective intent is irrelevant so long as the actions taken by the officer are objectively reasonable. *See Scott v. United States*, 436 U.S. 128, 138 (1978). Fourth Amendment jurisprudence forecloses "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996). Therefore, we consider whether the scope of the stop was objectively reasonable under the totality of the circumstances, without regard to the officer's subjective intent.

¶31    As Miller correctly points out, the authority for a seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 1614. But the question is whether the officer pursued his investigation in "a diligent and reasonable manner," not whether the investigation may have been accomplished by less intrusive means. *United States v. Sharpe*, 470 U.S. 675, 687 (1985). "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Id.* at 686–87. "A court should not micromanage the details of a traffic stop to ensure that no actions of the police improperly extend the stop so long as the duration of the stop is reasonable under the totality of the circumstances." *State v. Baker*, 2010 UT 18, ¶ 17, 229 P.3d 650.

¶32 The district court properly declined Miller's invitation to micromanage the details of the stop by "telling the officer the order in which he has to perform the duties that are related to and permissible steps at a traffic stop." Other courts that have addressed this issue have similarly refused to require officers to initiate computer checks at the outset of traffic stops. *See, e.g.,* *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (recognizing that "neither our prior cases nor any other caselaw of which we are aware institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions"); *People v. Chavez-Barragan*, 2016 CO 66, ¶¶ 27–28, 379 P.3d 330 (holding that officers "failure to multitask" by calling in the driver license and registration at the outset of the traffic stop was not a constitutional violation).

¶33 The Georgia Supreme Court's analysis of a similar fact pattern is instructive. In *State v. Allen*, 779 S.E.2d 248 (Ga. 2015), the officer waited until "[a]bout eight minutes into the stop" before he radioed for a computer records check on both the driver and passenger. *Id.* at 251. While awaiting the response from dispatch on the passenger, the officer deployed a drug detection dog around the car. *Id.* Approximately three-and-a-half minutes later, the dog signaled an alert, giving the officer probable cause to continue the detention and search the car for narcotics. *Id.* at 260. The question on appeal was "whether the free-air dog sniff that resulted in probable cause to detain [the car's occupants] and search inside their car was done while some other task related to the mission of the traffic stop was still being conducted, so that the sniff did not add any time to the stop." *Id.* at 253–54.

¶34 In *Allen*, it was undisputed that the officer "walked his dog around the car while waiting for the results of the computer check" and that he "had finished all other mission-related actions by the time he retrieved his dog." *Id.* But the court noted that *Rodriguez* had "rejected the proposition that the

constitutional analysis depends on the order in which the officers complete their actions." *Id.* at 259. The court explained:

> The sequence of the officer's actions during a traffic stop is not determinative; instead, the primary question is whether the activity at issue was related to the mission of the stop. If it is not, like a dog sniff, it can be done only concurrently with a mission-related activity, or it will unlawfully add time to the stop. If, on the other hand, the task is a component of the traffic-stop mission, it may be done at any point during the stop. It does not matter if a mission-related activity takes place as soon as the stop begins or, as is the case here, after other mission-related activities have been completed.

*Id.* at 258–59. Because the court determined that a background check on a passenger is a mission-related activity, it held that such a mission-related activity could not unlawfully prolong the stop regardless of the order in which the officer accomplished those tasks.[7]

---

7. It is unclear whether our supreme court would reach the same conclusion under the facts in *Allen*. Recently, the Utah Supreme Court considered whether a background check of a passenger unconstitutionally prolonged a traffic stop. The court began "by underscoring that reasonable officer safety measures are related to the mission—and therefore to the scope—of a traffic stop itself." *State v. Martinez*, 2017 UT 43, ¶ 14, 424 P.3d 83. This statement suggests that the court would agree with the Georgia Supreme Court that a background check on a vehicle's occupant does not prolong an otherwise lawful stop because it is mission-related and therefore within the scope of the stop itself. However, the court went on to analyze whether the officer's

(continued…)

¶35    Here, the officer requested the records check about eleven minutes into the stop, after completing all but one part of the citation. The district court credited the officer's testimony "that he needed to hear back from dispatch before he could complete the citation." Although the officer received an immediate automated response that the license was valid, he did not yet have any information on whether Miller had outstanding warrants. Because checking outstanding warrants is a mission-related component of a traffic stop, this task did not extend the detention beyond its permissible scope. *See* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.3(c) (5th ed. 2018) (noting that, under *Rodriguez*, "determining whether there are outstanding warrants against the driver [is] a valid aspect of carrying out a traffic stop, . . . which means such action is permissible even if it *does* 'prolong' the traffic stop" (quotation simplified)). Although it may have been more efficient to call dispatch at the outset of the stop, we decline to prescribe the order in which an officer must complete mission-related tasks during a traffic stop so long as the officer is pursuing the investigation in a reasonably diligent manner.

## CONCLUSION

¶36    We conclude that the officer did not unconstitutionally extend the duration of the traffic stop by asking Miller to sit in

---

(…continued)

questioning and background check of the passenger "unreasonably extended the stop in question," *id.* ¶ 19, an analytical step that would be unnecessary if such actions were part of the stop's mission. Here, we need not reach the issue of whether the broader criminal background check was within the scope of the stop because it is undisputed that the officer was also waiting for information on whether Miller had any outstanding warrants when the drug dog signaled an alert.

the patrol car, by engaging in unrelated conversation, or by requesting a records check. Accordingly, we affirm the district court's denial of Miller's motion to suppress drug evidence found pursuant to a lawful dog sniff.

_____

ORME, Judge (dissenting):

¶37    I respectfully dissent from the majority's assessment of the "reasonableness" of the stop, primarily because of the circumstances surrounding the criminal-history check the officer conducted on Miller. While I agree with the majority that in most instances "[a] court should not micromanage the details of a traffic stop," *State v. Baker*, 2010 UT 18, ¶ 17, 229 P.3d 650, there are cases where the actions of an officer raise such concern that further scrutiny of the stop is required, *see Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (providing that the incidental checks conducted by an officer may not be performed "*in a way* that prolongs the stop") (emphasis added). *See also Baker*, 2010 UT 18, ¶ 17 ("A court should not micromanage the details of a traffic stop . . . *so long as the duration of the stop is reasonable under the totality of the circumstances.*") (emphasis added).

¶38    In this case, there are two causes for concern. First, Miller was stopped for going five miles above the posted speed limit, which is simply not something for which Utah drivers are pulled over when traveling on an interstate highway, in their own lane, during decent weather. And in his testimony, the officer acknowledged that he typically does not pull drivers over for such an insignificant infraction and that he actually pulled Miller over because Miller had "out-of-state plates" and such plates "are huge with drug transportation."[8] He also testified that his

_____

8. Such plates are also "huge" with legitimate visitors from out of state, who are far from a rarity in Utah, a state that actively

(continued…)

actions throughout the stop were driven by an intent to "gain suspicion" on Miller, raising questions about how diligent the officer was in wrapping up the issuance of a citation for the traffic offense. And second, the officer admitted that he "spend[s] more time" on certain stops, including running a criminal-history check on people he finds suspicious. Such admissions by an officer should, as a practical matter, trigger closer scrutiny of whether the officer deliberately acted in a manner to prolong the duration of the stop.

¶39　Here, the officer's request for a "Triple I check"[9] was based on a "suspicion"[10] that he had regarding Miller, not anything related to Miller's traffic offense or anything regarding a safety concern that arose during the stop. I agree with Miller that the officer prolonged the stop by requesting a "Triple I check" as a means to buy himself additional time to conduct the dog sniff.

---

(…continued)

positions itself as a tourist mecca. *See, e.g.*, Utah Office of Tourism, *Calendar Year 2017—Utah TravelTrakAmerica Visitor Profile Report & Insights* 16 (May 2018), https://travel.utah.gov/wp-content/uploads/CY17-Utah-Report-05182018.pdf [https://perma.cc/SS39-REZK] ("Utah hosts over 19 million visitors annually.").

9. A Triple I check refers to the "Interstate Identification Index," a "federal-state system for the exchange of criminal history records." 28 C.F.R. § 20.3(m) (2018).

10. Although the officer used the word "suspicion," he did not use the term in its Fourth Amendment sense—a "reasonable articulable suspicion" of criminality. *See State v. Baker*, 2010 UT 18, ¶ 13, 229 P.3d 650. He used the term as meaning a feeling, guess, or hunch.

¶40 Officers "may conduct certain unrelated checks during an otherwise lawful traffic stop," but they "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615. There are, to be sure, certain investigative activities unrelated to a traffic infraction that "are so common as to now be a part of [a] 'routine'" for officers during a stop, including "a records check via radio or computer regarding the criminal history of those stopped." 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.3(c), at 508 (5th ed. 2012). This type of inquiry "serves to identify drivers who deserve (at least in the officer's mind) more intense scrutiny," *id.* at 519, and aims at "detecting evidence of ordinary criminal wrongdoing" rather than "ensuring that vehicles on the road are operated safely and responsibly," *Rodriguez*, 135 S. Ct. at 1615 (quotation simplified). For a relatively minor traffic infraction, a criminal history "counts for very little [in assessing guilt for the infraction], but may lead to interrogation that is intense, very invasive and extremely protracted," LaFave, *Search & Seizure* § 9.3(c), at 517–18 (quotation simplified), "even though the purpose of the stop had nothing to do with such prior criminal history and even though there had not yet developed any reasonable suspicion of more serious criminal activity," *id.* at 518–19.

¶41 But, in certain circumstances, officer safety may justify running a criminal-history check because, "[b]y determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop." *United States v. Holt*, 264 F.3d 1215, 1221–22 (10th Cir. 2001) (en banc) (per curiam), *abrogated on other grounds as recognized by United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007). Such circumstances, however, must be based on a "subjective assessment of [a] safety risk." *See State v. Brake*, 2004 UT 95, ¶ 24, 103 P.3d 699.

¶42    In this case, officer safety was not a concern. It was a full eleven minutes into this uneventful stop before the officer requested Miller's criminal history, during which time Miller had done or said nothing to suggest he posed a threat to the officer's safety. At that point, the officer had essentially completed his citation, and it would have been more efficient, as well as safer, ultimately, for the officer to finish the last section of the citation and send Miller on his way. There was also nothing in Miller's behavior throughout those eleven minutes that suggested the officer's safety was at risk. And in his own words, the officer admitted that his only reason for requesting Miller's criminal history was to "gain suspicion," not to confirm or dispel a reasonable suspicion he had already formed or because, at the tail end of the stop, he suddenly became reasonably concerned about his safety. Because there was no officer safety or reasonable suspicion justification, the criminal-history check was "aimed at detecting evidence of ordinary criminal wrongdoing" and "detour[ed]" from the stop's mission. *Rodriguez*, 135 S. Ct. at 1615–16 (quotation simplified).

¶43    The State suggests that, because the criminal-history check occurred simultaneously with the warrants check, it is merely a matter of speculation as to how much time this informational detour added to the stop. The majority accepts this view, holding that there is no evidence "that a warrants check would have been completed in less than sixty seconds." *Supra* ¶ 29. But criminal-history checks are a "somewhat time-consuming task[]" that "can easily add to the total length of the stop," and often "take longer to process than the usual license and warrant requests." LaFave, *Search & Seizure* § 9.3(c), at 517 (quotation simplified). While the length of license and warrant checks may also vary, these types of checks are typically brief, especially given that most officers have computers installed in their patrol cars that give them access to this type of

data "almost instantaneous[ly]."[11] *Id.* at 512–13. *See also id.* at 508 n.155, 517. *Cf. United States v. Sanders*, 248 F. Supp. 3d 339, 342 (D. R.I. 2017) (officer testifying that the results for a license and warrants check "came back almost instantaneously") (quotation simplified); *State v. Martinez*, 2017 UT 43, ¶ 21, 424 P.3d 83 (officer testifying that it usually takes less than five seconds to run a license and warrants check).

¶44   Even in this case, the officer testified that a criminal record check can vary from one to eight minutes, but the length depends on the time it takes a dispatcher to locate a driver's criminal history and parse through that information to find any "pertinent" information that might be helpful to the officer. For example, the officer testified that there was an instance where 47 pages of criminal history took dispatch "seven, eight minutes" to go through. Here, it took dispatch over seven minutes to report back to the officer with Miller's criminal history. Suffice it to say, a criminal-history check adds measurable time to a more routine records check, and it is therefore unreasonable for an officer, without any safety justification or reasonable suspicion of criminal wrongdoing, to burden a stop for an exceedingly minor traffic infraction with a time-consuming investigation of a driver's criminal history.

¶45   Seemingly, the officer had a hunch that Miller was engaged in criminal wrongdoing and, as he testified, he was therefore going "to spend more time on it." "In assessing whether a detention is too long in duration . . . we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions *quickly*, during which time it was necessary to detain

---

11. In reviewing the video recording, it appears that the officer did run a license check, prior to requesting the Triple I check, which "almost instantaneously" announced that Miller's license was valid.

the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (emphasis added). But nothing in the officer's actions suggests that he acted diligently to conclude the traffic stop. Rather, he acknowledged that it is his practice to deliberately prolong stops to "gain suspicion" on certain drivers, which includes requesting criminal histories as a means to "gain suspicion." He did so in this case to buy additional time to conduct the dog sniff because he had essentially finished the citation and had already conducted the license check and, in fairness, Miller should then have been sent on his way. Regardless of whether the warrants check was simultaneous to the criminal-history check, there was no purpose for requesting Miller's criminal-history check, given its timing so late in the stop, other than to extend the length of the stop. *See Rodriguez*, 135 S. Ct. at 1615 ("An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."). Here, the officer was not reasonably diligent in concluding the purpose for the traffic stop, and he detained Miller beyond what was necessary for the completion of a singularly minor traffic offense.

¶46    I would reverse.

_____