NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JAMES HENRY PEROZZO,

                        Appellant,

            v.

STATE OF ALASKA,

                        Appellee.

Court of Appeals No. A-12967
Trial Court No. 3AN-16-01090 CR

O P I N I O N

No. 2706 — July 9, 2021

Appeal from the Superior Court, Third Judicial District, Anchorage, Mark Rindner and Michael D. Corey, Judges.

Appearances: Laurence Blakely, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Michal Stryszak, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

This appeal presents the question of whether a law enforcement officer conducting a routine traffic stop may request identification from a passenger in the vehicle and then use that identification to run a warrants check on the passenger, absent any case-specific justification for doing so. Because we conclude that this conduct

violates the Alaska Constitution, we reverse the trial court's denial of James Henry Perozzo's motion to suppress.

*Underlying facts and proceedings*

At approximately 5:40 p.m. on February 4, 2016, Anchorage Police Officer Michael Farr initiated a traffic stop at 15th Avenue near Sitka Street. The vehicle had an obscured license plate — *i.e.*, the rear license plate was not illuminated and it was dirty.[1] Perozzo was a passenger in the vehicle.

Officer Farr introduced himself and explained the reason for the stop. He then asked the driver for his driver's license, registration, and proof of insurance.

Farr also asked Perozzo for his identification: "Sir, do you mind if I see your I.D. real quick?" Perozzo asked why, stating that he was not doing anything wrong. Farr replied, "I'm just asking to see your I.D., that's all." At that point, Perozzo turned over his Alaska identification card.

Farr returned to his patrol car and ran both the driver's and Perozzo's names through the Alaska Public Safety Information Network (APSIN) database. Farr discovered that there was an outstanding search warrant for Perozzo's DNA. Farr called the detective who had issued the "locate" for Perozzo regarding the warrant, and the detective instructed Farr to detain Perozzo and take him to the police station, so that the detective could execute the warrant by obtaining buccal swabs of Perozzo's DNA.

Farr called for backup, and another officer, Anchorage Police Sergeant Shaun Henry, arrived on the scene. Both officers approached the vehicle in which Perozzo was sitting, and Farr ordered Perozzo to exit the vehicle.

---

[1]   Anchorage Municipal Code (AMC) 09.44.040; AMC 09.44.060.

According to Farr's later testimony, Perozzo then reached toward his waistband. Sergeant Henry took control of Perozzo, escorted him to the back of the car, and handcuffed him.

A pat-down search of Perozzo revealed an empty holster on Perozzo's right side, and the police found a handgun in between the driver and passenger seats of the vehicle. Perozzo acknowledged that the firearm was his, and he told Farr that he had removed the gun when he first got in the car because it was uncomfortable to wear along with the seatbelt. The police subsequently learned that Perozzo had a prior felony conviction.

Based on this conduct, a grand jury indicted Perozzo on one count of third-degree misconduct involving weapons (for being a felon in possession of a concealable firearm).[2] In addition, the State charged Perozzo by information with one count of fifth-degree misconduct involving weapons (for failing to immediately inform the police that he was armed).[3]

Prior to trial, Perozzo's attorney filed a motion to suppress the evidence seized as a result of the traffic stop. In this motion, Perozzo's attorney argued that Officer Farr had impermissibly expanded the scope of the traffic stop by asking Perozzo, a passenger, for his identification and then conducting a warrants check.[4] Perozzo's attorney argued that these unlawful actions led directly to the detention of Perozzo and to the discovery of the firearm and holster.

---

[2] AS 11.61.200(a)(1).

[3] AS 11.61.220(a)(1)(A).

[4] Perozzo also argued that the stop was pretextual, an argument that the trial court rejected. Perozzo does not challenge this ruling on appeal.

Officer Farr was the sole witness at the evidentiary hearing. Farr acknowledged that his request for Perozzo's identification bore no relationship to the traffic stop. But he explained that, as a matter of routine practice, he regularly requests identification from both drivers and passengers during traffic stops. Farr testified that if a passenger refuses to provide identification, and if he (Farr) has no reason to believe that the passenger has committed a traffic infraction or a crime, he "let[s] it go." But he did not "let it go" in this case because Perozzo "never told me that he didn't want to give me his driver's license."

Following the evidentiary hearing, the trial court denied Perozzo's motion to suppress. The court found that Farr's request for Perozzo's identification did not impermissibly expand the traffic stop. The court concluded that Farr could properly ask Perozzo for his identification and that, in any event, Perozzo had voluntarily given it to him.

Perozzo's case proceeded to trial. Relying on testimony that neither Farr nor the driver had noticed a gun in the center console area until after Perozzo had been removed from the vehicle, the prosecutor argued that Perozzo possessed the firearm at the time of the traffic stop and that he only removed it from the holster when he was ordered out of the vehicle. The jury convicted Perozzo of both charged counts.

On appeal, Perozzo renews his argument that the police unlawfully exceeded the scope of the traffic stop, and that the evidence pertaining to the firearm should have been suppressed. For the reasons explained in this opinion, we agree.

*Why we conclude that the police were precluded from requesting Perozzo's identification and using that identification to run a warrants check*

Both the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution prohibit unreasonable searches and seizures by the

government.[5]  A seizure of a person occurs whenever a government officer engages in a show of official authority such that a reasonable person would not believe that he or she is free to leave.[6]

The United States Supreme Court has held that a traffic stop qualifies as a "seizure" of both the driver and any passengers, since even a passenger would conclude that an officer was "exercising control to the point that no one in the car was free to depart without police permission":[7]

> A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on "privacy and personal security" does not normally . . . distinguish between passenger and driver.[8]

Because traffic stops are considered "a species of investigative stop rather than a formal arrest,"[9] they are generally evaluated under the principles enunciated by

---

[5]  *See Cowles v. State*, 23 P.3d 1168, 1170 (Alaska 2001).

[6]  *Waring v. State*, 670 P.2d 357, 364 (Alaska 1983); *Castle v. State*, 999 P.2d 169, 171 (Alaska App. 2000); *see Terry v. Ohio*, 392 U.S. 1, 17 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); *see also Florida v. Bostick*, 501 U.S. 429, 436 (1991) (recognizing that the appropriate inquiry in determining whether a seizure has occurred is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter").

[7]  *Brendlin v. California*, 551 U.S. 249, 255-57 (2007).

[8]  *Id.* at 557 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)).

[9]  *Brown v. State*, 182 P.3d 624, 625 (Alaska App. 2008); *see also Simmons v. State*, 435 P.3d 975, 977 (Alaska App. 2018) ("[I]n a routine traffic stop, a police officer is authorized to conduct a limited seizure for a limited purpose.").

the United States Supreme Court in *Terry v. Ohio* and related cases.[10]  Under *Terry*, a traffic stop "must be temporary and [must] last no longer than is necessary to effectuate the purpose of the stop."[11]  "The stop becomes unreasonable — and thus constitutionally invalid — if the duration, manner, or scope of the investigation" exceeds "the circumstances that justified the stop in the first place."[12]

The basic essentials of a traffic stop are relatively easy to discern with respect to the driver.  When an officer stops a driver for a traffic violation, "the officer may ask the motorist to produce routine driving documents" — including the driver's license, proof of insurance, and vehicle registration.[13]  A police officer may run a computer check to verify the validity of the driver's documents — in order to ensure that the driver is authorized to continue driving — and doing so does not generally unreasonably extend the scope or duration of a valid traffic stop.[14]  Even a warrants

---

[10]  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citing *Terry*, 392 U.S. 1).

[11]  *Brown*, 182 P.3d at 625 (alteration in original) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

[12]  *Id.* (citing *Royer*, 460 U.S. at 500, and *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).

[13]  *Clark v. Anchorage*, 112 P.3d 676, 678 (Alaska App. 2005) (quoting *United States v. Maldonado*, 356 F.3d 130, 134 (1st Cir. 2001)); *see also* AS 28.15.131(a) (requiring a licensee to carry a driver's license while driving a motor vehicle and to present the license to a peace officer upon demand); AS 28.10.081(b) (requiring the same with respect to vehicle registration); AS 28.22.019(a) (requiring the same with respect to proof of insurance).

[14]  *Fallon v. State*, 221 P.3d 1016, 1019 (Alaska App. 2010) ("By calling dispatch to check on the status of the license, [the trooper] did not unreasonably expand the scope or duration of the stop."); *see also Brown*, 182 P.3d at 629 (recognizing that a routine traffic stop for an equipment violation generally includes "a request for the motorist's driver's license, registration, and proof of insurance; a computer or radio check to verify the validity of these documents; and the issuance of an appropriate citation or warning" (citing 4 Wayne

(continued...)

check for the driver may reasonably be viewed as part of the traffic stop, "as long as this check [is] done expeditiously, so as not to significantly extend the duration of the stop."[15]

But the rationale for these "routine" checks is significantly diminished as to a passenger who has been seized solely by virtue of being present in a vehicle subject to a traffic stop — particularly for a minor equipment violation like a dirty or non-illuminated license plate.

It is undisputed in this case that Officer Farr did not suspect Perozzo of any wrongdoing when he requested his identification. Nor did Farr testify to any case-specific safety concerns or need to obtain Perozzo's identity. Rather, he testified that it was his regular practice to request identification from passengers.

The question we must therefore confront in this appeal is whether the Alaska Constitution permits an officer to request identification from a passenger and then use that identification to run a warrants check, absent any reasonable suspicion of wrongdoing by the passenger, or other particularized safety concerns or circumstances indicating a legitimate need to obtain a passenger's identification.

---

[14] (...continued)
R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3©, at 378 (4th ed. 2004))).

[15] *Brown*, 182 P.3d at 629 (citing 4 LaFave, *Search and Seizure* § 9.3(c), at 381-82); *see also* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3(c), at 519-20 (6th ed. 2020) (recognizing that "there are at least *some* rational arguments that can be made for retaining the warrant check routine as to a person who apparently has committed a traffic offense" since, for one thing, "the warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses" (emphasis in original)); *see also Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (noting that typical inquiries incident to a traffic stop involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979))).

Neither the United States Supreme Court nor the Alaska courts have yet addressed whether an officer's request for a passenger's identification and a subsequent warrants check fall within the scope of a "routine" traffic stop, and therefore may be done without a reasonable suspicion of criminality or other particularized justification.[16]

But over time, the United States Supreme Court has expanded the authority of police officers over both drivers and passengers during routine traffic stops. For instance, the Supreme Court has held that police officers may inquire into matters unrelated to the stop — as long as the inquiry does not unreasonably extend the stop.[17] The Court has also authorized officers to order both drivers and passengers to exit the vehicle, even absent a particularized safety concern.[18]

---

[16] *See Lovett v. State*, 2017 WL 2609219, at *3 & n.9 (Alaska App. June 14, 2017) (unpublished) ("[T]he State argues that we should join those jurisdictions which have held that the police may request identification and run background checks on passengers in stopped vehicles as a matter of course, so long as doing so does not unnecessarily extend the duration of the stop. We have no reason to decide that issue in this case[.]").

[17] *Compare Illinois v. Caballes*, 543 U.S. 405 (2005) (holding that use of a narcotics-detection dog to sniff around the exterior of motorist's vehicle during the temporal duration of the routine traffic stop did not infringe on motorist's Fourth Amendment rights), *with Rodriguez*, 575 U.S. 348 (holding that extending an otherwise-completed traffic stop in order to conduct a dog-sniff was impermissible under the Fourth Amendment, absent reasonable suspicion); *see also Arizona v. Johnson*, 555 U.S. 324, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *Brown*, 182 P.3d at 625, 632 (recognizing that the Fourth Amendment offers little protection to motorists who consent to a request to search their vehicle, even when the officer has no reason to suspect that the motorist is carrying contraband); 4 LaFave, *Search and Seizure* § 9.3(b), at 510-11.

[18] *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (authority under federal law to order the driver out of the car); *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (authority under federal law to order passengers out of the car). *Compare Erickson v. State*, 141 P.3d

(continued...)

In line with this authority, all federal circuit courts to address the issue have concluded that officers may request a passenger's identification during a traffic stop and run a warrants check, even absent an independent basis for doing so[19] — at least as long as doing so does not unreasonably extend the duration of the stop.[20] Several state courts have reached similar conclusions, grounding their decisions in (1) generalized concerns

[18] (...continued) 356, 359 (Alaska App. 2006) (holding that the officer had legitimate case-specific reasons for ordering Erickson, a passenger, out of the vehicle during a traffic stop); *State v. Smith*, 637 A.2d 158 (N.J. 1994) (declining to extend *Mimms* to passengers as a matter of state law). We have not yet decided whether the Alaska Constitution authorizes officers to order drivers and/or passengers to exit a vehicle during a traffic stop, even absent a case-specific reason for doing so, and the State does not ask us to do so here. *See Simmons v. State*, 435 P.3d 975, 977 n.1 (Alaska App. 2018).

[19] *See United States v. Fernandez*, 600 F.3d 56, 61 (1st Cir. 2010) ("Although the [Supreme] Court has not explicitly held that an inquiry into a *passenger's* identity is permissible, its precedent inevitably leads to that conclusion." (emphasis in original)); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." (internal citation omitted)); *see also United States v. Pack*, 612 F.3d 341, 351 (5th Cir. 2010) (holding that officers do not need reasonable suspicion to ask a passenger for his or her identification during a lawful traffic stop and run a computer check on the passenger's license and background); *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (same); *United States v. Sanford*, 806 F.3d 954, 959 (7th Cir. 2015) (same); *United States v. Cloud*, 594 F.3d 1042, 1044 (8th Cir. 2010) (same); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152-53 (9th Cir. 2007) (same); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (same); *United States v. Purcell*, 236 F.3d 1274, 1278-79 (11th Cir. 2001) (same). *But see United States v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019) (holding that an officer may not *order* a passenger to identify himself absent particularized suspicion that he has or is engaged in criminal activity).

[20] *See, e.g.*, *Fernandez*, 600 F.3d at 61-62 (discussing *United States v. Henderson*, 463 F.3d 27, 46-47 (1st Cir. 2006)).

for officer safety;[21] (2) the need to create a record of witnesses to the traffic stop;[22] or (3) a determination that the request is simply part of (and did not unreasonably extend) the investigation into the traffic violation and does not constitute a separate Fourth Amendment event.[23]

Other state courts, however, have concluded that officers are prohibited from requesting identification from passengers during a traffic stop, absent reasonable suspicion of wrongdoing or some other case-specific justification beyond general officer safety concerns.[24]

---

[21] *See, e.g.*, *State v. Williams*, 590 S.E.2d 151, 154 (Ga. App. 2003); *Cade v. State*, 872 N.E.2d 186, 189 (Ind. App. 2007); *State v. Martinez*, 424 P.3d 83, 89-90 (Utah 2017) (collecting cases).

[22] *See, e.g.*, *State v. Griffith*, 613 N.W.2d 72, 82 (Wisc. 2000).

[23] *See, e.g.*, *State v. Ybarra*, 751 P.2d 591, 592 (Ariz. App. 1987); *People v. Vibanco*, 151 Cal. App. 4th 1, 14, 60 Cal. Rptr. 3d 1, 10-11 (Cal. App. 2007); *People v. Bowles*, 226 P.3d 1125 (Colo. App. 2009); *Loper v. State*, 8 A.3d 1169, 1173 (Del. 2010); *People v. Harris*, 886 N.E.2d 947 (Ill. 2008); *State v. Smith*, 683 N.W.2d 542, 547-48 (Iowa 2004); *State v. Landry*, 588 So.2d 345, 345-47 (La. 1991); *State v. Gutierrez*, 611 N.W.2d 853, 858 (Neb. App. 2000); *Cortes v. State*, 260 P.3d 184, 190 (Nev. 2011).

[24] *See, e.g.*, *People v. Spicer*, 157 Cal. App. 3d 213, 221, 203 Cal. Rptr. 599, 604-05 (Cal. App. 1984) (holding that an officer unlawfully requested the passenger's license during a traffic stop for drunk driving, where there was no indication that the passenger would be given custody of the car and the officer did not explain to the passenger his reason for requesting her driver's license); *Commonwealth v. Alvarez*, 692 N.E.2d 106, 109 (Mass. App. 1998) (holding that an officer, who testified that he asked the defendant, a vehicle passenger, for his license out of "routine practice" and without any objective basis for suspecting the passenger of wrongdoing, violated the Massachusetts Constitution); *State v. Johnson*, 645 N.W.2d 505, 510 (Minn. App. 2002) (holding that, in the absence of reasonable suspicion of criminal wrongdoing, the officer had no authority to expand the stop by taking the passenger's identification and running a warrants check on him); *State v. Affsprung*, 87 P.3d 1088, 1094-95 (N.M. App. 2004) (holding, under the Fourth Amendment, that a generalized

(continued...)

For instance, in *Commonwealth v. Alvarez*, the Massachusetts Appeals Court held that a police officer may not request a passenger's identification without reasonable suspicion of criminal activity, or some other case-specific circumstance justifying the inquiry.[25] The court reasoned that, once the driver produces a valid license and registration during a routine traffic stop (*e.g.*, for speeding), an officer is able to issue a traffic citation and must then allow the car to continue on its way.[26] The court characterized the officer's testimony that he regularly requested passenger identification during routine traffic stops — even absent any reason to suspect passenger wrongdoing — as "the sort of dragnet interrogation" that the Massachusetts Constitution prohibits.[27] The court further suggested that this type of inquiry constitutes "the sort of

---

[24] (...continued)

concern for officer safety, without more, was insufficient to justify requesting the defendant's identification and conducting a warrants check, where the defendant was simply a passenger in a vehicle stopped for a faulty license plate light); *State v. Thompkin*, 143 P.3d 530, 534-36 (Or. 2006) (holding that the defendant, a passenger in a vehicle stopped for failing to signal a turn, was unlawfully seized under the Oregon Constitution when the officer requested and retained his identification to run a records check, without any reasonable suspicion of criminal activity); *State v. Rankin*, 92 P.3d 202, 206-07 (Wash. 2004) (en banc) (holding that the Washington Constitution precludes officers from requesting identification from a passenger for investigative purposes, absent an independent basis for making the request).

[25] *Commonwealth v. Alvarez*, 692 N.E.2d 106, 108 (Mass. App. 1998) (noting the absence of any testimony by the officer that he had reason to fear for his safety or that the passenger was in need of some assistance), *cited favorably in Commonwealth v. Sinforoso*, 749 N.E.2d 128, 131 n.2 (Mass. 2001).

[26] *Alvarez*, 692 N.E.2d at 108.

[27] *Id.* (citing *Commonwealth v. Torres*, 674 N.E.2d 638, 641-43 (Mass. 1997) (holding that an officer may not interrogate passengers unless the officer has "reasonable suspicion, grounded in specific, articulable facts" that a particular passenger is involved in criminal activity or "other suspicious conduct")).

request uncomfortably associated with authoritarian societies and most commonly made of persons belonging to a racial or ethnic minority."[28]

Similarly, in *State v. Rankin*, the Washington Supreme Court held that the Washington Constitution prohibits an officer from requesting a passenger's identification during a lawful traffic stop unless the officer has an independent basis for doing so.[29] *Rankin* was a consolidated case. In *Rankin*, an officer initiated a traffic stop after observing a car "roll over a marked stop line."[30] Rankin was a passenger in the car. During the stop, the officer recalled that he had arrested Rankin approximately one month earlier for possession of a stolen vehicle and possession of controlled substances, but the officer did not observe Rankin engage in any criminal behavior during this traffic stop.[31] The officer asked the driver and Rankin for their identifications and both complied. A subsequent warrants check revealed that Rankin had an outstanding warrant for his arrest. The officer placed Rankin under arrest and, after a search incident to the arrest, the deputy found a knife and methamphetamine on Rankin's person.[32]

---

[28] *Id.* at 109; *see also State v. Affsprung*, 87 P.3d 1088, 1094-95 (N.M. App. 2004) (holding that an officer must have an independent reason — "more than a generalized concern about officer safety" — in order to request a passenger's identification during a routine traffic stop, and that holding otherwise would "open[] a door to the type of indiscriminate, oppressive, fearsome authoritarian practices and tactics of those in power than the Fourth Amendment was designed to prohibit"), *cert. denied*, 135 N.M. 320 (N.M. 2004).

[29] *State v. Rankin*, 92 P.3d 202, 203, 207 (Wash. 2004) (en banc).

[30] *Id.* at 203.

[31] *Id.*

[32] *Id.* at 204.

In the companion case, *State v. Staab*, an officer stopped a vehicle for an unlit license plate; Staab was a passenger in the vehicle.[33] The officer asked both the driver and Staab to produce their driver's licenses. When Staab removed his identification card from his shirt pocket, a bag of white powder fell out. The officer determined that there were no existing warrants for Staab, but arrested him on the belief that the bag contained cocaine, which Staab later admitted.[34]

The Washington Supreme Court held that both requests for identification were impermissible. Noting that the Washington Constitution contains an explicit privacy clause — "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law"[35] — the court held that an officer may not "request identification from a passenger for investigatory purposes unless there is an independent basis to support the request."[36]

The court acknowledged having previously held that an officer's request for identification from a pedestrian does not alone constitute a seizure.[37] However, the court noted that "a passenger faced with undesirable questioning by the police does not have the realistic alternative of leaving the scene as does a pedestrian."[38] Rather, the court observed that a passenger would be forced to "abandon his or her chosen mode of

---

[33] *Id.*

[34] *Id.*

[35] Wash. Const. art. I, § 7.

[36] *Rankin*, 92 P.3d at 206-07.

[37] *Id.* at 206 (discussing *State v. Young*, 957 P.2d 681, 687 (Wash. 1998) (en banc)).

[38] *Id.*

transportation and, instead, walk away into a frequently foreign location thereby risking the departure of his or her ride while away."[39]

We are persuaded that the decisions by Massachusetts and Washington, and other similar cases, more closely align with the heightened privacy protections afforded by the Alaska Constitution. Like Washington, Alaska has an explicit guarantee of privacy under our state constitution.[40] In part because of this privacy protection, both the Alaska Supreme Court and this Court have repeatedly interpreted Article I, Section 14 of the Alaska Constitution to provide greater protection to Alaskans than the corresponding provisions of the Fourth Amendment.[41]

Our decision in *Brown v. State* is emblematic of the broader scope of our search and seizure clause in the traffic stop context.[42] In *Brown*, we held that an officer's questions to a driver about other potential crimes, and an officer's requests for permission to conduct a search, during a routine traffic stop are "significant events"

---

[39] *Id.* (citing Wayne R. LaFave, *The Present and Future Fourth Amendment*, U. Ill. L. Rev. 111, 114-15 (1995)). *Rankin* remains good law. *See State v. Pettit*, 251 P.3d 896, 898 (Wash. App. 2011) (recognizing, in reliance on *Rankin*, that the privacy clause of the Washington Constitution "prohibits law enforcement officials from requesting identification from passengers for investigative purposes unless there is an independent basis that justifies that request"); *see also State v. Demmon*, 2018 WL 5985324, at *3 (Wash. App. Nov. 13, 2018) (unpublished).

[40] *See* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed.").

[41] *See Anchorage Police Dep't Emp. Ass'n v. Anchorage*, 24 P.3d 547, 550 (Alaska 2001) ("Alaska's search and seizure clause is stronger than the federal protection because article I, section 14 is textually broader than the Fourth Amendment, and the clause draws added strength from Alaska's express guarantee of privacy."); *Brown v. State*, 182 P.3d 624, 633 & n.13 (Alaska App. 2008) (collecting cases interpreting Alaska's search and seizure clause more broadly than the Fourth Amendment).

[42] *Brown*, 182 P.3d 624.

under Article I, Section 14 of the Alaska Constitution.[43]  We further held that, under the circumstances of Brown's case, the officer was prohibited from requesting Brown's permission to conduct a search that was "(1) unrelated to the basis for the stop and (2) not otherwise supported by a reasonable suspicion of criminality."[44]  We concluded that, because of the frequency of traffic violations and the inherent coerciveness of traffic stops — and the attendant likelihood that motorists will accede to an officer's request to search — the permissive rules governing traffic stops under the Fourth Amendment were insufficient to protect Alaska motorists since they "create[d] the potential risk that law enforcement officers will compromise the privacy of many citizens," without any grounds for doing so.[45]

We similarly conclude that the request for a passenger's identification is a significant event under the Alaska Constitution — and that an officer is precluded from requesting a passenger's identification and then using that identification to run a warrants check when the officer's request is unrelated to the basis for the stop and the officer has no other case-specific justification for doing so.  A routine identification and warrants check on a passenger, without any basis for doing so, runs the risk of "turning a routine traffic stop into a 'fishing expedition for criminal activity unrelated to the stop'" — and thus systematically infringing on Alaskans' right to privacy.[46]

---

[43]  *Id.* at 626.

[44]  *Id.*

[45]  *Id.*

[46]  *Hornberger v. Am. Broadcasting Cos.*, 799 A.2d 566, 614 (N.J. Super. App. Div. 2002) (quoting *State v. Carty*, 790 A.2d 903, 905 (N.J. 2002)); *see also* 4 Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment* § 9.3(c), at 528 (6th ed. 2020) ("Putting aside those cases where the warrant check was upheld because [it was] connected

(continued...)

The State raises several arguments as to why we should reach a different result in this case.

First, the State argues that permitting officers to request identification and perform background checks on passengers in stopped vehicles serves important officer safety concerns, by allowing an officer to take steps to prevent an encounter from turning violent. We recognize the significant threats to officer safety that can arise during traffic stops and agree that officer safety is an important concern. But Perozzo was a passenger in a vehicle that was pulled over in the early evening, on a busy road in Anchorage, for an equipment violation — i.e., an obscured license plate. Officer Farr did not testify that he had any particularized concerns for his safety, and the trial court made no factual findings to support such a conclusion.[47]

Indeed, Farr testified that he requests identification from passengers as a matter of routine practice in every traffic stop — and that if Perozzo had refused to give him his identification, he would have "let it go." Under these circumstances, we conclude that a generalized concern for officer safety, without more, is insufficient to override the rights of passengers in relation to routine traffic stops.[48]

---

[46] (...continued)
with a driver's license check on a passenger who was to assume the driving duties, it is to be doubted whether there is any valid reason for automatic warrant checks on mere passengers.").

[47] *Cf. Erickson v. State*, 141 P.3d 356, 359, 361-62 (Alaska App. 2006) (recognizing that an officer has the authority to order a passenger out of the vehicle if the officer's action is reasonably related to particularized concerns for the officer's safety, and once the passenger is out of the vehicle, the officer may subject the passenger to a pat-down search if the officer has a reasonable basis to conclude that the passenger is armed and dangerous).

[48] *See State v. Affsprung*, 87 P.3d 1088, 1094-95 (N.M. App. 2004); *see also Simmons v. State*, 435 P.3d 975, 978 (Alaska App. 2018) (noting that "actions taken in the name of
(continued...)

Second, the State argues that an officer's request for identification from a vehicle passenger is permissible, so long as the conduct does not unreasonably extend the duration of the traffic stop. The State cites *Pooley v. State*, where we said that "the mere request for identification does not automatically render [a] stop a seizure, where it does not appear that the identification was retained for an unnecessarily long time."[49]

But unlike the pedestrian who was stopped in *Pooley* and in the other cases cited by the State,[50] Perozzo was already seized by virtue of being a passenger in a vehicle stopped for a traffic violation.[51] That is, he was "situated in a vehicle that [was] not free to be driven away."[52]

Moreover, in *Brown*, we rejected the notion that "the legal nature of [a] stop remains unaltered" if a police officer's questions — otherwise unrelated to the basis for the stop — "do not extend the expected temporal duration of a traffic stop."[53] Rather, a

---

[48]  (...continued)
protecting officer safety must stem 'from the mission of the [traffic] stop itself'" (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)) (alteration in *Simmons*)).

[49]  *Pooley v. State*, 705 P.2d 1293, 1306 (Alaska App. 1985).

[50]  *Id.*; *Wright v. State*, 795 P.2d 812, 815 (Alaska App. 1990); *LeMense v. State*, 754 P.2d 268, 270 (Alaska App. 1988); *see also INS v. Delgado*, 466 U.S. 210, 216 (1984) (recognizing that "a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure").

[51]  *Brendlin v. California*, 551 U.S. 249, 255-57 (2007).

[52]  *See Affsprung*, 87 P.3d at 1093 ("A passenger in a vehicle stopped because of a traffic-related violation is situated in a vehicle that is not free to be driven away . . . . Because of this and because of the fact that the driver is not free to refuse an officer's request for identification and documentation, we do not believe that a reasonable passenger would feel free to leave the area and refuse the officer's request for information.").

[53]  *Brown v. State*, 182 P.3d 624, 626 (Alaska App. 2008).

police officer's conduct during a stop must also be "reasonably related in *scope*" to the circumstances that justified the stop in the first place.[54]

Perozzo was not suspected of any crime or traffic violation himself, nor was he engaged in any suspicious behavior. Running a background check on a passenger like Perozzo as a matter of course, and in the absence of any articulable case-specific reason for doing so, alters the fundamental nature of the traffic stop and thus exceeds the scope of the original stop in violation of Article I, Section 14 of the Alaska Constitution.

Third, the State contends that Perozzo voluntarily consented to providing his identification. But we agree with other courts that have held that, given the coercive circumstances of a traffic stop and the fact that the *driver* is otherwise required to provide a driver's license and other documents, a reasonable passenger would not feel free to refuse an officer's request for identification during a routine traffic stop.[55]

When the State relies on the consent exception to the warrant requirement, the State has the burden to prove both that the defendant actually consented and that this consent was voluntary — *i.e.*, unequivocal, specific, and intelligently given, and uncontaminated by duress or coercion.[56] In other words, "[a]cquiescence to apparent lawful authority" is not enough,[57] and the State bears the burden of proving that the

---

[54] *Id.* at 625 (emphasis added) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).

[55] *See, e.g.*, *Affsprung*, 87 P.3d at 1093; *State v. Johnson*, 645 N.W.2d 505, 510 (Minn. App. 2002).

[56] *Gieffels v. State*, 590 P.2d 55, 62 (Alaska 1979); *Schaffer v. State*, 988 P.2d 610, 613 (Alaska App. 1999) (citing *Erickson v. State*, 507 P.2d 508, 515 (Alaska 1973)).

[57] *Schaffer*, 988 P.2d at 616.

consent is untainted by any implicit threats or subtle coercion that may exist in the circumstances.[58]

Here, the State has not met its burden of showing that Perozzo's decision to accede to the officer's request was anything more than "acquiescence to apparent lawful authority."[59] This is particularly true in light of the fact that Perozzo directly questioned Officer Farr's authority to request his identification, and the officer did not otherwise inform Perozzo of his right to decline to provide identification.[60] In our view, the same coercive circumstances that we identified in *Brown* apply to police requests for identification from passengers during routine traffic stops.[61] By directly requesting a

---

[58] *See Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that a State's burden to prove voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. 1982) (emphasizing that "acquiescence cannot . . . substitute for free consent" and acknowledging the potential "implicit threats or subtle coercion" that can occur in an airport setting); *Schaffer*, 988 P.2d at 615-16 (distinguishing between voluntary, uncoerced consent and mere acquiescence to apparent lawful authority, and holding that the defendant's assent for airport security to search her carry-on luggage was nothing more than acquiescence to apparent lawful authority).

[59] *See Affsprung*, 87 P.3d at 1094 ("In reality, few passengers in this circumstance would, in our view, feel free to ignore an officer's request for identification, or feel free to get out of the vehicle and leave the area after either refusing to give the information or even after providing it.").

[60] *See People v. Spicer*, 157 Cal. App. 3d 213, 220, 203 Cal. Rptr. 599, 603-04 (Cal. App. 1984) (holding that, where "the circumstances [were] pregnant with coercion" during a traffic stop at 1:30 a.m., an admonition that the passenger need not comply with request for driver's license was called for before encounter would be considered voluntary); *see also United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (noting that knowledge of the right to refuse consent is "highly relevant" to assessing the voluntariness of that consent).

[61] *Brown v. State*, 182 P.3d 624, 626-27 (Alaska App. 2008) (recognizing the "psychological pressures inherent in [a traffic] stop").

– 19 – 2706

passenger's identification in the course of an ordinary traffic stop, "the officer conveys a message that compliance with his request is necessary."[62]

Finally, the State argues that, even if Officer Farr violated Perozzo's constitutional rights, evidence of the firearm should not be suppressed because its discovery was attenuated from the illegality by the discovery and execution of the search warrant.[63] Under the attenuation doctrine, evidence derived as a result of unconstitutional police conduct is not subject to exclusion if "the connection between [the] unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."[64]

In *McBath v. State*, we applied this doctrine to uphold the admission of evidence obtained following an illegal stop and the discovery of an outstanding warrant.[65] We stated that, when determining whether the evidence sought to be suppressed is sufficiently attenuated from the taint of a Fourth Amendment violation, "our primary consideration must be our duty to enforce the policy of the exclusionary rule — the policy of deterring the police from engaging in misconduct by imposing a meaningful penalty for that misconduct."[66] We explained that the attenuation doctrine applied to McBath's case for two main reasons: (1) even if the police unlawfully

[62] *Affsprung*, 87 P.3d at 1094.

[63] *See McBath v. State*, 108 P.3d 241 (Alaska App. 2005); *see also Utah v. Strieff*, 136 S.Ct. 2056 (2016).

[64] *Strieff*, 136 S.Ct. at 2061 (internal quotations omitted).

[65] *McBath*, 108 P.3d at 248.

[66] *Id.*

detained McBath, this misconduct was not egregious because the police "had a valid reason for wishing to know McBath's name" — *i.e.*, he was taking possession of another arrestee's property; and (2) after receiving McBath's real name, the evidence was only found after the police discovered and executed McBath's arrest warrants.[67]

Unlike in *McBath*, however, Officer Farr had no valid, case-specific reason for obtaining Perozzo's identification and running a warrants check. This was not an "isolated instance"[68] — Farr testified that he requested passenger identification and ran warrant checks based on that information as part of a routine practice. If the existence of a warrant could then be used to cleanse any taint from this illegal conduct, there would be no deterrent for the conduct and the attendant violation of the passenger's right to privacy, fundamentally undermining the purpose of the exclusionary rule.[69] We therefore decline to find that the discovery of a warrant during a suspicionless warrants check on a passenger severs the link between the illegal conduct and the discovery of evidence when the police act on the warrant.

Second, and more particularly to Perozzo's case, the trial court specifically found that the search warrant in this case was invalid. After Perozzo's attorney litigated the motion to suppress that is at issue in this appeal, the attorney filed a second motion to suppress, arguing that the warrant itself was not supported by probable cause, and that the evidence seized pursuant to the warrant should be suppressed. The trial court agreed with Perozzo that the warrant was not supported by probable cause and was therefore

---

[67] *Id.* at 250.

[68] *Strieff*, 136 S.Ct. at 2063 (distinguishing a stop that constitutes an "isolated instance of negligence" from stops evidencing "systemic or recurrent police misconduct").

[69] *McBath*, 108 P.3d at 248.

invalid.[70] (However, relying on the United States Supreme Court's decision in *United States v. Leon*,[71] the trial court found that the police relied in good faith on the warrant and therefore denied Perozzo's second motion. Perozzo does not challenge this ruling on appeal, although we note that Alaska courts have never decided whether to adopt this good-faith exception to the exclusionary rule.[72])

The State does not offer a persuasive reason, or any meaningful support, for the notion that the discovery and execution of an invalid warrant can dispel the taint of a prior constitutional illegality. At oral argument, the State acknowledged that it was unable to find a case with similar facts. Indeed, in a recent case addressing whether the attenuation doctrine should apply to evidence obtained following an illegal stop and the discovery of an outstanding warrant — a situation very similar to *McBath* — the United States Supreme Court repeatedly conditioned its description of the warrant at issue (and the accompanying rule) as involving a "valid" warrant.[73] We therefore reject the State's request to uphold the trial court's denial of Perozzo's first motion to suppress based on the attenuation doctrine.

---

[70] The court found that the warrant — which sought Perozzo's DNA in a possible sexual assault case — failed to establish probable cause that Perozzo recklessly disregarded the complainant's lack of consent.

[71] *United States v. Leon*, 468 U.S. 897 (1984).

[72] *Jackson v. State*, 926 P.2d 1180, 1184 n.1 (Alaska App. 1996) (noting that Alaska courts have not adopted a "good faith" exception to the exclusionary rule).

[73] *See Strieff*, 136 S.Ct. at 2061 (addressing "whether [the attenuation] doctrine applies at all to a case like this, where the intervening circumstance that the State relies on is the discovery of a *valid*, pre-existing, and untainted arrest warrant" (emphasis added)); *id.* at 2061-62 (setting out a three-part analysis for evaluating whether "the discovery of a *valid* arrest warrant was a sufficient intervening event to break the causal chain between [an] unlawful stop and the discovery of drug-related evidence on [the defendant's] person" (emphasis added)).

For all these reasons, we conclude that the trial court should have granted Perozzo's motion to suppress.[74]

*Conclusion*

We REVERSE the judgment of the superior court.

---

[74] Perozzo also argues, and the State agrees, that the two attachments to the presentence report and the reference to the attachments in the report itself should be deleted from the report, consistent with the trial court's ruling. The State's concession is well-founded. *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (requiring an appellate court to independently assess whether a concession of error is supported by the record and has legal foundation). Although we are reversing Perozzo's convictions, we direct the superior court to make these deletions given the sensitive nature of the documents.